ABRAHAM LEDERMAN, as President of Teachers Union of the City of New York, Local 555 of the United Public Workers, et al., Plaintiffs, v. BOARD OF EDUCATION OF THE CITY OF NEW YORK, Defendant.

Supreme Court, Special Term, Kings County, December 14, 1949.

Pressman, Witt & Cammer for plaintiffs.

John P. McGrath, Corporation Counsel (Michael A. Castaldi and Morris Weissberg of counsel), for defendant.

Ralph Shapiro for International Fur & Leather Workers Union of the United States, amicus curiæ.

Paul O'Dwyer, Michael B. Atkins, Howard N. Meyer and Herbert I. Silverman for New York City Chapter of National Lawyers Guild, amicus curiæ.

Matthew J. Shevlin for American Legion of Queens County, amicus curiæ.

HEARN, J. This is an action for a permanent injunction and a judgment declaring unconstitutional chapter 360 of the Laws of 1949 (commonly known as the Feinberg Law), section 12-a of the Civil Service Law (as implemented by the Feinberg Law) and the regents' rules and commissioner's memorandum promulgated thereunder.

There are three motions before the court — one for a temporary injunction, another for leave to intervene as parties plaintiff and the third, by plaintiffs, for judgment on the pleadings. Since a decision on the third will dispose of all issues, the court will consider it first.

The plaintiffs are a heterogeneous group. Among them are the teachers' union, other unions, parents, parent-teacher associations, citizens, a social worker, the head of a religious group, teachers and taxpayers. The answer denies that any of them have the right to maintain this action.

There are only two groups of plaintiffs whose claim of a right to sue has substance — the teachers and the taxpayers.

As to the teachers, defendant, says there is no justiciable controversy. No list has yet been promulgated by the Board of Regents — hence no teacher has been or can be accused of being a member of a listed subversive organization — in short, no one has been hurt. Plaintiff teachers, however, maintain that

they are hurt by the very existence of the law on the books —
that they are presently restrained in the exercise of their rights
of free speech, free thought·and freedom of association because
they fear the sanctions contained in the statute — and that
" uncertainty, peril and insecurity result from imminent and
immediate threats to asserted rights ". They say they should
be allowed to sue now — that they should not have to wait until
a list has been promulgated and then show that by membership
in a listed subversive organization they are aggrieved.

Were this an open question the court would be inclined to
agree with plaintiffs. If they must violate the law to gain the
right to challenge it, they risk inevitable discharge from their
positions. " To require these employees first to suffer the
hardship of a discharge is not only to make them incur a
penalty; it makes inadequate, if not wholly illusory, any legal
remedy which they may have. Men who must sacrifice their
means of livelihood in order to test their rights to their jobs
must either pursue prolonged and expensive litigation as unem-
ployed persons or pull up their roots, change their life careers,
and seek employment in other fields. At least to the average
person in the lower income groups the burden of taking that
course is irreparable injury ". (*United Public Workers* v.
*Mitchell,* 330 U. S. 75, 117–118 [dissent by DOUGLAS, J.].)

Cogent as this argument may be, the court nevertheless is
bound by the ruling of the majority in the above-cited case —
and that ruling was that there is no justiciable controversy, in
a case such as this, until the law has first been violated. Accord-
ingly, plaintiff teachers have no right to now maintain this
action.

The right of the taxpayer plaintiffs presents a different
proposition. Section 51 of the General Municipal Law permits
a taxpayer to sue to prevent " any illegal act  *  *  *  or
 *  *  * waste or injury to  *  *  * property, funds or estate
of  *  *  * [a] municipal corporation." Defendant comes
within the scope of this section " in so far at least as to
authorize an action by a taxpayer to prevent waste of the city's
money " (*Lewis* v. *Board of Education of City of N. Y.,* 258
N. Y. 117, 120).

The complaint among other things alleges that defendant
intends and threatens " to allocate and expend public funds "
to effectuate the Feinberg Law; that defendant's imminent
acts will cause further substantial waste of public funds; and
that enforcement of the law " will involve substantial cost in

time, supplies and material ". The answer denies these allegations but admits that defendant intends and threatens and has taken steps immediately to effectuate the law.

The court need not ignore common sense and everyday experience in appraising the pleaded facts. It is self-evident — and defendant, in fact, does not dispute it — that under the law an elaborate system of investigation will be set up. (See New York City Supt. of Schools' Proposed Order for Enforcement of the Feinberg Law, *New York Times,* Sept. 13, 1949, p. 32, col. 3.) Moreover, should charges be preferred against any teachers, extensive hearings necessarily will be held. (See Regents' Rules on Subversive Activities, p. 12; Rules of Bd. of Regents of Univ. of State of New York, ch. XV-B, § 254.) The investigations and hearings will, of course, involve a liberal use of personnel time and consumption of material and supplies bought with public funds. It is worth noting, in this connection, that the Lusk Law (L. 1921, ch. 666), which was similar in many respects, carried with it an appropriation for the enforcement expenses of the State Department of Education. It is fair to assume that the enforcement of the law here under consideration likewise will require the expenditure of public funds.

In view of the foregoing the court holds that plaintiff taxpayers have the right to sue. In any event, it being vitally important to the public at large and the school system in particular that the real issue herein be speedily determined, the court should not " pause to consider whether the question is presented in appropriate proceedings." (*Matter of Kuhn* v. *Curran,* 294 N. Y. 207, 213.)

Since there are no issues of fact raised by the pleadings the motion for judgment will be considered on the substantive legal issue involved.

The problem posed by these statutes has many facets. Yet essentially they raise but one basic question — How far may the State go in imposing restrictions or conditions on employment as teachers in the public schools?

In seeking the answer to this question it should be borne in mind that to impart the principles of democracy, freedom of thought and speech must be preserved in the school setting. The atmosphere must be one which encourages able independent men to enter the teaching profession. To develop good citizens teachers must give students the facts, help them to learn to think and urge them to reach their own conclusions. To so

teach, the teacher must himself be free to think and speak. He must not be under threat of enforced conformity to rigid standards; he must be free of blind censorship; he must be open-minded to new ideas — even when they do not appear to be orthodox. The heart of American education is independent thought. This was best stated in the charge of Judge MEDINA in the recent trial of *United States* v. *Foster* (*New York Times,* Oct. 14, 1949, p. 15, col. 6):

" I charge you that if the defendants did no more than pursue peaceful studies and discussions or teaching and advocacy in the realm of ideas, you must acquit them.

" For example, it is not unlawful to conduct in an American college or university a course explaining the philosophical theories set forth in the books which have been placed in evidence by the prosecution such as the Communist Manifesto, Foundations of Leninism and so on. Of course these books are to be found in public libraries and in the libraries of American universities.

" Indeed, many of our most outstanding and sincere educators have expressed the view that these theories should be widely studied and thoughtfully considered, so that all may thoroughly appreciate their significance and the inevitable effects of putting such theories into practice."

We must also recognize that both State and teacher have dual characters. The State is both employer and government — the teacher both employee and citizen. Hence the State, like any employer, may impose a condition on employment that bears a reasonable relationship to the duties to be performed (N. Y. Const., art. V, § 6). Such condition may be valid even though it impinges upon the basic constitutional right of free speech if it is essential to the integrity of the public service and if the infringement is limited to the necessities of the situation.

But, unlike a private employer, the State is restricted to a considerable extent both as to the nature of the condition imposed and the manner of its imposition. Thus it may not bar one from public employment because of race, religion or political affiliation (*United Public Workers* v. *Mitchell,* 330 U. S. 75, 100, *supra*). Nor may it bar one from public employment, even though the reason be sound, if the method employed constitutes conviction and punishment without a judicial trial (*United States* v. *Lovett,* 328 U. S. 303). No more may the State bar teachers from the schools for even a highly desirable

and necessary reason if the method employed violates " due process ".

It is particularly needful that we reaffirm and re-emphasize this doctrine at this stage in our history. In this connection it would be well to ponder a passage from *The Times* of London, written more than a hundred years ago (Aug. 11, 1846). It appears in " Ordeal by Planning ", by John Jewkes (p. vi):

" The greatest tyranny has the smallest beginnings. From precedents overlooked, from remonstrances despised, from grievances treated with ridicule, from powerless men oppressed with impunity, and overbearing men tolerated with complacence, springs the tyrannical usage which generations of wise and good men may hereafter perceive and lament and resist in vain. At present, common minds no more see a crushing tyranny in a trivial unfairness or a ludicrous indignity, than the eye uninformed by reason can discern the oak in the acorn, or the utter desolation of winter in the first autumnal fall. Hence the necessity of denouncing with unwearied and even troublesome perseverance a single act of oppression. Let it alone and it stands on record. The country has allowed it and when it is at last provoked to a late indignation it finds itself gagged with the record of its own ill compulsion." The court well knows that at the present time there are those who would launch a widespread attack on our institutions through the outward appearance of democratic process. They proceed by stealth and in disguise to destroy that which they appear to defend. But " historic liberties and privileges are not to bend from day to day ' because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment ' (HOLMES, J., in *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400)'' nor should they " change their form and content in response to the ' hydraulic pressure ' (HOLMES, J., *supra*) exerted by great causes." (*Matter of Doyle,* 257 N. Y. 244, 268.)

There is yet another principle by which the court must be guided. A law which intrudes upon freedom of speech, thought or association comes into court bare of the usual presumption of validity because of " the preferred place given in our scheme " to these freedoms. And it is the character of the right, not of the limitation, which establishes what standard shall be used in determining " where the individual's freedom ends and the State's power begins " (*Thomas* v. *Collins,* 323 U. S. 516, 529, 530).

With these principles clearly in mind — cognizant always that every legal picture must have a moral frame — remembering that "the life of the law has not been logic; it has been experience" (Oliver Wendell Holmes), let us examine the laws and rules here attacked.

It should be noted at the outset that the Feinberg Law is a new administrative statute implementing two older laws (Education Law, § 3021 and Civil Service Law, § 12-a). Its provisions merely establish procedures to facilitate enforcement of these two earlier statutes, they being substantive in nature.

Since its provisions refer to hearings and presumptions it may be well here to point out the rules relevant thereto.

Due process ordinarily requires "a fair and open hearing" with "not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them" (*Morgan* v. *United States*, 304 U. S. 1, 18).

Presumptions may be created by statute only if there is "'some rational connection between the fact proved and the ultimate fact presumed, and the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate'" (*McFarland* v. *American Sugar Co.*, 241 U. S. 79, 86).

What are these statutes and rules? What do they seek to accomplish? How do they operate?

The Feinberg Law provides, *inter alia*, that the Board of Regents shall promulgate a list of "subversive" organizations after inquiry and "such notice and hearing as may be appropriate". The character and conduct of the hearing thus may be left to the unfettered discretion of the regents. Under such provision it well may happen that an allegedly subversive organization, after appropriate notice to appear at a hearing, defaults and subsequently is listed by the regents following an uncontested hearing. If it be assumed, as of course we may, that the regents will properly enforce the law, such enforcement necessarily would be as follows: adequate notice of a hearing is given to an organization; a full and proper hearing is had; but no member of the organization was in fact represented at the hearing, such member not having been a party to the proceeding. After the hearing let us further assume that the organization is placed on the list of subversive organizations.

Should the organization or a member wish to challenge this listing it would seem that this could be done in a proceeding

pursuant to article 78 of the Civil Practice Act. But in a comparable situation the courts have held that they will not review such administrative action because no justiciable controversy exists. (*Joint Anti-Fascist Refugee Committee* v. *Clark*, 177 F. 2d 79; *International Workers Order* v. *Clark*, U. S. Dist. Ct., D. C., April 12, 1949, McGuire, J.; *National Council for Soviet American Friendship* v. *Clark*, C. A. D. C.) A teacher is then charged with membership in the listed organization. At such hearing the organization is deemed to be subversive within the definition of section 12-a of the Civil Service Law even though the finding was by an administrative body and, as to the accused teacher, the supporting evidence was hearsay and he had no opportunity to meet it. In short — the listing, as to him, was ex parte.

Is there any reasonable connection, under these circumstances, between the fact supposedly " proved " and the fact presumed? Is it consonant with American traditions of fairness to base on so flimsy a foundation a presumption which establishes the major portion of the case against an accused and casts upon him the burden of disproving substantially what it took the Government eleven months to establish in the recent trial in the United States District Court (Southern District, New York) before Judge Medina in the case of *United States* v. *Foster?*

But this presumption as to the character of the organization is not the only burden placed upon an accused teacher. The statute is ambiguous as to whether past as well as present membership is proscribed. Though the regents' rules interpret it as forbidding only present membership, they create a presumption of continuance of past membership " in the absence of a showing that such membership has been terminated *in good faith.*" (Rules of Bd. of Regents of Univ. of State of New York, § 254, subd. 2; italics supplied.) This rule well may be invalid under the constitutional ban on ex post facto legislation. (See *Calder* v. *Bull*, 3 Dallas [U. S.] 386.) Aside from this, however, it clearly places upon an accused teacher the oppressive burden of showing his innocence through affirmative proof of something as nebulous and intangible as " good faith " — and this in the face of the inevitable and justifiable skepticism which any realistic hearing officer must have as to the " good faith " of one accused of membership in a subversive organization.

There are yet other inequities in the procedure. A teacher found guilty by the board of education has a right of appeal.

Section 310 of the Education Law gives the right to appeal to the State Commissioner of Education. Section 2523 of the Education Law gives an alternative right of appeal to the courts in an article 78 proceeding. Subdivision (d) of section 12-a of the Civil Service Law provides for appeal to the courts where disqualification is pursuant to section 12-a. These three sections apparently overlap, and, to some extent, conflict with each other. In the present state of the law there is to say the least, serious doubt as to whether any one of them exclusively controls and, if so, which — or whether they provide alternate remedies. (See *Matter of Nestler* v. *Board of Examiners*, 192 Misc. 663.) If the appeal is taken to the Commissioner of Education (under Education Law, § 310), that section provides that his determination is *final* and cannot be reviewed by the courts. In such case it is possible that the regents' listing of an organization and the teacher's disqualification thereunder would constitute conviction and punishment without a judicial trial. If the appeal be taken to the courts in an article 78 proceeding (under Education Law, § 2523) the court's review might well be inadequate " if not illusory " (*Kirn* v. *Noyes*, 262 App. Div. 581, 584), since it is but a limited review on the record alone and the determination could be disturbed only if it had no warrant in the record, no reasonable basis in law and was arbitrary or capricious. It has been the unfortunate tendency of our courts in recent years largely to abdicate their true functions and powers in proceedings to review the determination of administrative bodies, so that today " 'the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body ' " (*Matter of Park East Land Corp.* v. *Finkelstein*, 299 N. Y. 70, 75). Here too, then, for all practical purposes, the procedure might be tantamount to conviction and punishment without judicial trial.

The teacher seeking to appeal finds himself confronted with still another question: Can he appeal to the courts under subdivision (d) of section 12-a of the Civil Service Law, where the disqualification was under the procedure established by the Feinberg Law? The Feinberg Law itself neither contains machinery for appeals nor refers to any other statute in that regard. However, it is part of the Education Law, as are sections 310 and 2523, previously referred to, and these three sections deal exclusively with teachers and administrative personnel of the Department of Education. Section 12-a of the Civil Service Law, on the other hand, is a general statute applicable to all civil service employees of the State and city.

It seems likely that the appeal statutes dealing specifically with teachers (Education Law, §§ 310 and 2523) would control the general statute dealing with all civil service employees (Civil Service Law, § 12-a) and consequently would bar the right of a teacher to come into court under subdivision (d) of section 12-a.

In short, a teacher discharged under the Feinberg Law would find himself on the horns of a dilemma. If he appeals to the Commissioner of Education he loses his recourse to the courts; if he starts an article 78 proceeding the court's review (on the record alone) is "inadequate if not illusory"; if he goes into court under subdivision (d) of section 12-a of the Civil Service Law he probably will be confronted with a court ruling that his proper remedy was under section 310 or 2523 of the Education Law — and this at a time when, in all likelihood, the Statute of Limitations already has run on these other remedies.

Finally, an analysis of the Feinberg Law and of subdivision (c) of section 12-a of the Civil Service Law, as implemented, discloses that they unmistakably embody the doctrine of guilt by association, which doctrine has been condemned by the United States Supreme Court (*Schneiderman* v. *United States,* 320 U. S. 118, 136).

As previously indicated the Feinberg Law is an administrative statute that provides machinery for the enforcement of section 12-a of the Civil Service Law, the latter being substantive in nature. Section 12-a defines the offense — the Feinberg Law provides how its commission may be established.

The following are the offenses defined in section 12-a: Subdivisions (a) and (b) disqualify teachers who personally advocate violent overthrow of the government by every conceivable form of utterance, oral or written. In short, they cover all forms of *personal* guilt. Consequently, subdivision (c), which disqualifies one who "becomes a member of any society" that advocates the proscribed doctrines, obviously adds another form of guilt — guilt through mere membership in a subversive organization even in the absence of personal guilt. Though personal nonguilt would thus be a defense to a charge made under subdivision (a) or (b), it would be no defense where the charge is mere membership under subdivision (c).

What does the Feinberg Law provide as to how a charge of membership in a subversive organization (under § 12-a, subd. [c]) shall be proved? It first directs the Board of Regents to promulgate a list of organizations which advocate the doctrines

prohibited by section 12-a. It then provides that membership in " any such organization included in such listing " shall constitute prima facie evidence of disqualification. Disqualification for what offense? Obviously for membership in an organization that advocates violent overthrow. of the government. But this offense (defined in § 12-a subd. [c]) has only two elements — membership in an organization and advocacy by the organization of violent overthrow of the government. The first element, membership, must be established by direct proof. The second, advocacy by the organization of the proscribed doctrine, is established prima facie by the fact that the organization has been listed by the Board of Regents — the intention of the Legislature, of course, being to obviate the need for a protracted trial each time a teacher is accused of membership under section 12-a. The two together make out a complete case against the teacher. Should the teacher defend, what defenses may he interpose? Only the same two that he could formerly interpose to a charge under subdivision (c) of section 12-a alone — either his nonmembership or the organization's nonadvocacy of proscribed doctrines. For the offense with which he is charged, under Feinberg Law procedures, is still a violation of subdivision (c) of section 12-a — membership in an organization that advocates violent overthrow of the government. Here again then, personal nonguilt is no defense since the charge is still mere membership even though the administrative procedure employed is that set out in the Feinberg Law. What this constitutes, of course, is the finding of guilt from mere association without proof of personal guilt. That this may not be done under our law is clear.

In the court's charge to the jury in the case of *United States* v. *Foster,* which involved a prosecution under a comparable statute, Judge MEDINA said (*New York Times,* Oct. 14, 1949, p. 15, col. 7): " Under our system of law, guilt is purely personal and * * * you may not find any of the defendants guilty merely by reason of the fact that he is a member of the Communist Party * * * no matter what you find were the principles and doctrines which were taught or advocated by that Party." This has been the most recent reiteration of the established principle that: " under our traditions beliefs are personal and not a matter of mere association, and * * * men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles ". (*Schneiderman* v. *United*

*States,* 320 U. S. 118, 136, *supra;* see, also, Loyalty Tests and Guilt by Association, JOHN LORD O'BRIAN, 61 Harv. L. Rev. 592.)

The cumulative effect of the procedure as outlined then is this: At an " appropriate " hearing by the Board of Regents (an administrative body) an organization is found to advocate violent overthrow of the government; a member, as such, of the organization may not be present at this hearing; neither the organization nor a member can review this determination in the courts. A teacher thereafter is charged with membership. At his hearing he is confronted with two onerous presumptions which he must affirmatively meet — presumptions which make out an entire prima facie case against him. They are (1) a presumption of the organization's guilt, based on an administrative board's nonreviewable hearing and finding which was ex parte and hearsay as to the teacher on trial; and (2) a presumption of continuance of past membership rebuttable only by showing its termination " in good faith ". Then should he be found guilty and discharged, his rights on appeal are ambiguous and essentially inadequate. And the capstone of this jerry-built structure is the finding of guilt from mere membership, without any proof of personal guilt — the teacher's personal nonguilt in fact being irrelevant where the only charge is membership.

It does not appear to this court that these procedures add up to " those fundamental requirements of fairness which are of the essence of due process " (*Morgan* v. *United States,* 304 U. S. 1, 19, *supra*).

Consequently subdivision (c) of section 12-a of the Civil Service Law (as implemented by the Feinberg Law), subdivision 2 of section 3022 of the Education Law (Feinberg Law) and the Regents' rules promulgated thereunder are unconstitutional under the due process clause of the 14th Amendment.

In so holding it may be observed that the foregoing determination in no way impairs the power of the Board of Regents, under the other adequate provisions of existing law, to promulgate and enforce reasonable rules and regulations designed to rid the school system of teachers found to be unfit.

In view of this determination, the motion to intervene is denied and the motion for a temporary injunction is not passed upon.

Judgment upon the pleadings is granted to plaintiffs to the extent indicated. Submit orders and judgment accordingly.