## ADLER ET AL. *v.* BOARD OF EDUCATION OF THE CITY OF NEW YORK.

No. 8.   Argued January 3, 1952.—Decided March 3, 1952.

*Osmond K. Fraenkel* argued the cause for appellants. With him on the brief was *Arthur Garfield Hays.*

*Michael A. Castaldi* argued the cause for appellee. With him on the brief were *Denis M. Hurley, Seymour B. Quel, Daniel T. Scannell* and *Bernard Friedlander.*

By special leave of Court, *Wendell P. Brown,* Solicitor General, argued the cause for the State of New York, as *amicus curiae,* urging affirmance. With him on the brief were *Nathaniel L. Goldstein,* Attorney General, and *Ruth Kessler Toch,* Assistant Attorney General.

*Dorothy Kenyon, Raymond L. Wise* and *Herbert Monte Levy* filed a brief for the American Civil Liberties Union, as *amicus curiae,* supporting appellants.

MR. JUSTICE MINTON delivered the opinion of the Court.

Appellants brought a declaratory judgment action in the Supreme Court of New York, Kings County, praying that § 12–a of the Civil Service Law,[1] as implemented by

---

[1] N. Y. Laws 1939, c. 547, as amended N. Y. Laws 1940, c. 564.

the so-called Feinberg Law,[2] be declared unconstitutional, and that action by the Board of Education of the City of New York thereunder be enjoined. On motion for judgment on the pleadings, the court held that subdivision (c) of § 12–a, the Feinberg Law, and the Rules of the State Board of Regents promulgated thereunder violated the Due Process Clause of the Fourteenth Amendment, and issued an injunction. 196 Misc. 873, 95 N. Y. S. 2d 114. The Appellate Division of the Supreme Court reversed, 276 App. Div. 527, 96 N. Y. S. 2d 466, and the Court of Appeals affirmed the judgment of the Appellate Division, 301 N. Y. 476, 95 N. E. 2d 806. The appellants come here by appeal under 28 U. S. C. § 1257.

Section 12–a of the Civil Service Law, hereafter referred to as § 12–a, is set forth in the margin.[3] To implement

---

[2] N. Y. Laws 1949, c. 360.

[3] "§ 12–a. *Ineligibility*

"No person shall be appointed to any office or position in the service of the state or of any civil division or city thereof, nor shall any person presently employed in any such office or position be continued in such employment, nor shall any person be employed in the public service as superintendents, principals or teachers in a public school or academy or in a state normal school or college, or any other state educational institution who: (a) By word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means; or

"(b) Prints, publishes, edits, issues or sells, any book, paper, document or written or printed matter in any form containing or advocating, advising or teaching the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown by force, violence or any unlawful means, and who advocates, advises, teaches, or embraces the duty, necessity or propriety of adopting the doctrine contained therein;

"(c) Organizes or helps to organize or becomes a member of any society or group of persons which teaches or advocates that the government of the United States or of any state or of any political sub-

this law, the Feinberg Law was passed, adding a new section, § 3022, to the Education Law of the State of New York, which section so far as here pertinent is set forth in the margin.[4] The Feinberg Law was also to implement

division thereof shall be overthrown by force or violence, or by any unlawful means;

"(d) A person dismissed or declared ineligible may within four months of such dismissal or declaration of ineligibility be entitled to petition for an order to show cause signed by a justice of the supreme court, why a hearing on such charges should not be had. Until the final judgment on said hearing is entered, the order to show cause shall stay the effect of any order of dismissal or ineligibility based on the provisions of this section. The hearing shall consist of the taking of testimony in open court with opportunity for cross-examination. The burden of sustaining the validity of the order of dismissal or ineligibility by a fair preponderance of the credible evidence shall be upon the person making such dismissal or order of ineligibility."

[4] "§ 3022. *Elimination of subversive persons from the public school system*

"1. The board of regents shall adopt, promulgate, and enforce rules and regulations for the disqualification or removal of superintendents of schools, teachers or employees in the public schools in any city or school district of the state who violate the provisions of section three thousand twenty-one of this article or who are ineligible for appointment to or retention in any office or position in such public schools on any of the grounds set forth in section twelve–a of the civil service law and shall provide therein appropriate methods and procedure for the enforcement of such sections of this article and the civil service law.

"2. The board of regents shall, after inquiry, and after such notice and hearing as may be appropriate, make a listing of organizations which it finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or of any political subdivision thereof shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section twelve–a of the civil service law. Such listings may be amended and revised from time to time. The board, in making such inquiry, may utilize any similar listings or designations promulgated by any federal

§ 3021 of the Education Law of New York.[5]  The constitutionality of this section was not attacked in the proceedings below.

The preamble of the Feinberg Law, § 1, makes elaborate findings that members of subversive groups, particularly of the Communist Party and its affiliated organizations, have been infiltrating into public employment in the public schools of the State; that this has occurred and continues notwithstanding the existence of protective statutes designed to prevent the appointment to or retention in employment in public office, and particularly in the public schools, of members of any organizations which teach or advocate that the government of the United States or of any state or political subdivision thereof shall be overthrown by force or violence or by any other unlawful means.  As a result, propaganda can be disseminated among the children by those who teach them and to whom they look for guidance, authority, and leadership.  The Legislature further found that the members of such groups use their positions to advocate and teach their doctrines, and are frequently bound by

---

agency or authority authorized by federal law, regulation or executive order, and for the purposes of such inquiry, the board may request and receive from such federal agencies or authorities any supporting material or evidence that may be made available to it. . The board of regents shall provide in the rules and regulations required by subdivision one hereof that membership in any such organization included in such listing made by it shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the state."

[5] "§ 3021.  *Removal of superintendents, teachers and employees for treasonable or seditious acts or utterances*

"A person employed as superintendent of schools, teacher or employee in the public schools, in any city or school district of the state, shall be removed from such position for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position."

oath, agreement, pledge, or understanding to follow, advocate and teach a prescribed party line or group dogma or doctrine without regard to truth or free inquiry. This propaganda, the Legislature declared, is sufficiently subtle to escape detection in the classroom; thus, the menace of such infiltration into the classroom is difficult to measure. Finally, to protect the children from such influence, it was thought essential that the laws prohibiting members of such groups, such as the Communist Party or its affiliated organizations, from obtaining or retaining employment in the public schools be rigorously enforced. It is the purpose of the Feinberg Law to provide for the disqualification and removal of superintendents of schools, teachers, and employees in the public schools in any city or school district of the State who advocate the overthrow of the Government by unlawful means or who are members of organizations which have a like purpose.

Section 3022 of the Education Law, added by the Feinberg Law, provides that the Board of Regents, which has charge of the public school system in the State of New York, shall, after full notice and hearing, make a listing of organizations which it finds advocate, advise, teach, or embrace the doctrine that the government should be overthrown by force or violence or any other unlawful means, and that such listing may be amended and revised from time to time.

It will be observed that the listings are made only after full notice and hearing. In addition, the Court of Appeals construed the statute in conjunction with Article 78 of the New York Civil Practice Act, Gilbert-Bliss' N. Y. Civ. Prac., Vol. 6B, so as to provide listed organizations a right of review.

The Board of Regents is further authorized to provide in rules and regulations, and has so provided, that membership in any listed organization, after notice and hearing, "shall constitute prima facie evidence for disquali-

fication for appointment to or retention in any office or position in the school system"; [6] but before one who is an employee or seeks employment is severed from or denied employment, he likewise must be given a full hearing with the privilege of being represented by counsel and the right to judicial review.[7] It is § 12–a of the Civil Service Law, as implemented by the Feinberg Law as above indicated, that is under attack here.

It is first argued that the Feinberg Law and the rules promulgated thereunder constitute an abridgment of the

[6] "§ 254. *Disqualification or removal of superintendents, teachers and other employes.*

"2. *List of subversive organizations to be issued.* Pursuant to chapter 360 of the Laws of 1949, the Board of Regents will issue a list, which may be amended and revised from time to time, of organizations which the Board finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the Government of the United States, or of any state or of any political subdivision thereof, shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section 12–a of the Civil Service Law. Evidence of membership in any organization so listed on or after the tenth day subsequent to the date of official promulgation of such list shall constitute *prima facie* evidence of disqualification for appointment to or retention of any office or position in the school system. Evidence of membership in such an organization prior to said day shall be presumptive evidence that membership has continued, in the absence of a showing that such membership has been terminated in good faith." Official Compilation of Codes, Rules and Regulations of the State of New York (Fifth Supp.), Vol. 1, pp. 205–206.

[7] The Court of Appeals construed the statute in conjunction with § 12–a subd. [d], *supra*, n. 3. The Rules of the Board of Regents provided: "In all cases all rights to a fair trial, representation by counsel and appeal or court review as provided by statute or the Constitution shall be scrupulously observed." Section 254, 1 (e), Official Compilation of Codes, Rules and Regulations of the State of New York (Fifth Supp.), Vol. 1, p. 206.

freedom of speech and assembly of persons employed or seeking employment in the public schools of the State of New York.

It is clear that such persons have the right under our law to assemble, speak, think and believe as they will. *Communications Assn.* v. *Douds,* 339 U. S. 382. It is equally clear that they have no right to work for the State in the school system on their own terms. *United Public Workers* v. *Mitchell,* 330 U. S. 75. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere. Has the State thus deprived them of any right to free speech or assembly? We think not. Such persons are or may be denied, under the statutes in question, the privilege of working for the school system of the State of New York because, first, of their advocacy of the overthrow of the government by force or violence, or, secondly, by unexplained membership in an organization found by the school authorities, after notice and hearing, to teach and advocate the overthrow of the government by force or violence, and known by such persons to have such purpose.

The constitutionality of the first proposition is not questioned here. *Gitlow* v. *New York,* 268 U. S. 652, 667–672, construing § 161 of the New York Penal Law.

As to the second, it is rather subtly suggested that we should not follow our recent decision in *Garner* v. *Los Angeles Board,* 341 U. S. 716. We there said:

"We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relation-

ship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment." 341 U. S., at p. 720.

We adhere to that case. A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate.

If, under the procedure set up in the New York law, a person is found to be unfit and is disqualified from employment in the public school system because of membership in a listed organization, he is not thereby denied the right of free speech and assembly. His freedom of choice between membership in the organization and employment in the school system might be limited, but not his freedom of speech or assembly, except in the remote sense that limitation is inherent in every choice. Certainly such limitation is not one the state may not make in the exercise of its police power to protect the schools from pollution and thereby to defend its own existence.

It is next argued by appellants that the provision in § 3022 directing the Board of Regents to provide in rules and regulations that membership in any organization listed by the Board after notice and hearing, with provision for review in accordance with the statute, shall constitute prima facie evidence of disqualification, denies due process, because the fact found bears no relation to the fact presumed. In other words, from the fact found that the organization was one that advocated the overthrow of government by unlawful means and that the person employed or to be employed was a member of the organization and knew of its purpose,[8] to presume that such member is disqualified for employment is so unreasonable as to be a denial of due process of law. We do not agree.

> "The law of evidence is full of presumptions either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded. . . .
>
> "Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, National and state, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous." *Mobile, J. & K. C. R. Co.* v. *Turnipseed,* 219 U. S. 35, at p. 42.

Membership in a listed organization found to be within the statute and known by the member to be within the

---

[8] In the proceedings below, both the Appellate Division of the Supreme Court and the Court of Appeals construed the statute to require such knowledge. 276 App. Div. 527, 530, 96 N. Y. S. 2d 466, 470–471; 301 N. Y. 476, 494, 95 N. E. 2d 806, 814–815.

statute is a legislative finding that the member by his membership supports the thing the organization stands for, namely, the overthrow of government by unlawful means. We cannot say that such a finding is contrary to fact or that "generality of experience" points to a different conclusion. Disqualification follows therefore as a reasonable presumption from such membership and support. Nor is there here a problem of procedural due process. The presumption is not conclusive but arises only in a hearing where the person against whom it may arise has full opportunity to rebut it. The holding of the Court of Appeals below is significant in this regard:

> "The statute also makes it clear that . . . proof of such membership 'shall constitute prima facie evidence of disqualification' for such employment. But, as was said in *Potts* v. *Pardee* (220 N. Y. 431, 433): 'The presumption growing out of a *prima facie* case . . . remains only so long as there is no substantial evidence to the contrary. When that is offered the presumption disappears, and unless met by further proof there is nothing to justify a finding based solely upon it.' Thus the phrase '*prima facie* evidence of disqualification,' as used in the statute, imports a hearing at which one who seeks appointment to or retention in a public school position shall be afforded an opportunity to present substantial evidence contrary to the presumption sanctioned by the *prima facie* evidence for which subdivision 2 of section 3022 makes provision. Once such contrary evidence has been received, however, the official who made the order of ineligibility has thereafter the burden of sustaining the validity of that order by a fair preponderance of the evidence. (Civil Service Law, § 12–a, subd. [d].) Should an order of ineligibility then issue, the party aggrieved thereby may avail himself of the provisions for review prescribed by

the section of the statute last cited above. In that view there here arises no question of procedural due process." 301 N. Y. 476, at p. 494, 95 N. E. 2d 806, at 814–815.

Where, as here, the relation between the fact found and the presumption is clear and direct and is not conclusive, the requirements of due process are satisfied.

Without raising in the complaint or in the proceedings in the lower courts the question of the constitutionality of § 3021 of the Education Law of New York, appellants urge here for the first time that this section is unconstitutionally vague. The question is not before us. We will not pass upon the constitutionality of a state statute before the state courts have had an opportunity to do so. *Asbury Hospital* v. *Cass County,* 326 U. S. 207, 213–216; *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 460–462; *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 546.

It is also suggested that the use of the word "subversive" is vague and indefinite. But the word is first used in § 1 of the Feinberg Law, which is the preamble to the Act, and not in a definitive part thereof. When used in subdivision 2 of § 3022, the word has a very definite meaning, namely, an organization that teaches and advocates the overthrow of government by force or violence.

We find no constitutional infirmity in § 12–a of the Civil Service Law of New York or in the Feinberg Law which implemented it, and the judgment is

*Affirmed.*

Mr. Justice Black, dissenting.

While I fully agree with the dissent of Mr. Justice Douglas, the importance of this holding prompts me to add these thoughts.

This is another of those rapidly multiplying legislative enactments which make it dangerous—this time for school

teachers—to think or say anything except what a transient majority happen to approve at the moment. Basically these laws rest on the belief that government should supervise and limit the flow of ideas into the minds of men. The tendency of such governmental policy is to mould people into a common intellectual pattern. Quite a different governmental policy rests on the belief that government should leave the mind and spirit of man absolutely free. Such a governmental policy encourages varied intellectual outlooks in the belief that the best views will prevail. This policy of freedom is in my judgment embodied in the First Amendment and made applicable to the states by the Fourteenth. Because of this policy public officials cannot be constitutionally vested with powers to select the ideas people can think about, censor the public views they can express, or choose the persons or groups people can associate with. Public officials with such powers are not public servants; they are public masters.

I dissent from the Court's judgment sustaining this law which effectively penalizes school teachers for their thoughts and their associates.

Mr. Justice Frankfurter, dissenting.

We are asked to pass on a scheme to counteract what are currently called "subversive" influences in the public school system of New York. The scheme is formulated partly in statutes and partly in administrative regulations, but all of it is still an unfinished blueprint. We are asked to adjudicate claims against its constitutionality before the scheme has been put into operation, before the limits that it imposes upon free inquiry and association, the scope of scrutiny that it sanctions, and the procedural safeguards that will be found to be implied for its enforcement have been authoritatively defined. I think we should adhere to the teaching of this Court's history to

avoid constitutional adjudications on merely abstract or speculative issues and to base them on the concreteness afforded by an actual, present, defined controversy, appropriate for judicial judgment, between adversaries immediately affected by it. In accordance with the settled limits upon our jurisdiction I would dismiss this appeal.

An understanding of the statutory scheme and the action thus far taken under it is necessary to a proper consideration of the issues which for me control disposition of the case, namely, standing of the parties and ripeness of the constitutional question.

A New York enactment of 1949 precipitated this litigation. But that legislation is tied to prior statutes. By a law of 1917 "treasonable or seditious" utterances or acts barred employment in the public schools. New York Education Law, § 3021. In 1939 a further enactment disqualified from the civil service and the educational system anyone who advocates the overthrow of government by force, violence or any unlawful means, or publishes material advocating such overthrow or organizes or joins any society advocating such doctrine. New York Civil Service Law, § 12-a. This states with sufficient accuracy the provisions of this Law, which also included detailed provisions for the hearing and review of charges.

During the thirty-two years and ten years, respectively, that these laws have stood on the books, no proceedings, so far as appears, have been taken under them. In 1949 the Legislature passed a new act, familiarly known as the Feinberg Law, designed to reinforce the prior legislation. The Law begins with a legislative finding, based on "common report" of widespread infiltration by "members of subversive groups, and particularly of the communist party and certain of its affiliated organizations," into the educational system of the State and the evils attendant upon that infiltration. It takes note of existing laws and exhorts the authorities to greater endeavor

of enforcement. The State Board of Regents, in which are lodged extensive powers over New York's educational system, was charged by the Feinberg Law with these duties:

(1) to promulgate rules and regulations for the more stringent enforcement of existing law;

(2) to list "after inquiry, and after such notice and hearing as may be appropriate" those organizations membership in which is proscribed by subsection (c) of § 12–a of the Civil Service law;

(3) to provide in its rules and regulations that membership in a listed organization shall be *prima facie* evidence of disqualification under § 12–a;

(4) to report specially and in detail to the legislature each year on measures taken for the enforcement of these laws.

Accordingly, the Board of Regents adopted Rules for ferreting out violations of § 3021 or § 12–a. An elaborate machinery was designed for annual reports on each employee with a view to discovering evidence of violations of these sections and to assuring appropriate action on such discovery. The Board also announced its intention to publish the required list of proscribed organizations and defined the significance of an employee's membership therein in proceedings for his dismissal. These Rules by the Board of Regents were published with an accompanying Memorandum by the Commissioner of Education. He is the administrative head of New York's school system and his Memorandum was for the guidance of school officials throughout the State. It warned of the danger of indiscriminate or careless action under the Feinberg Law and the Regents' Rules, and laid down this duty:

"The statutes and the Regents' Rules make it clear that it is a primary duty of the school authorities

in each school district to take positive action to eliminate from the school system any teacher in whose case there is evidence that he is guilty of subversive activity. School authorities are under obligation to proceed immediately and conclusively in every such case."

The Rules and Memorandum appear in the record; we shall have occasion to refer later to their relevance to what was decided below. Our attention has also been called to an order of the Board of Education of the City of New York, the present appellee. This order further elaborates the part of the Regents' Rules dealing with reports on teachers. It is not clear whether this order has gone into effect. In any event it was not before the lower courts and is not in the record here.

It thus appears that we are asked to review a complicated statutory scheme prohibiting those who engage in the kind of speech or conduct that is proscribed from holding positions in the public school system. The scheme is aligned with a complex system of enforcement by administrative investigation, reporting and listing of proscribed organizations. All this must further be related to the general procedures under the New York law for hearing and reviewing charges of misconduct against educational employees, modified as those procedures may be by the Feinberg Law and the Regents' Rules.

This intricate machinery has not yet been set in motion. Enforcement has been in abeyance since the present suit, among others, was brought to enjoin the Board of Education from taking steps or spending funds under the statutes and Rules on the theory that these transgressed various limitations which the United States Constitution places on the power of the States. The case comes here on the bare bones of the Feinberg Law only partly given flesh by the Regents' Rules. It was decided wholly on pleadings: a complaint, identifying the plaintiffs and their

interests, setting out the offending statutes and Rules, and concluding in a more or less argumentative fashion that these provisions violate numerous constitutional rights of the various plaintiffs; an answer, denying that the impact of the statute is unconstitutional and that the plaintiffs have any interest to support the suit.   On these pleadings summary judgment in favor of some of the plaintiffs was granted by the Supreme Court in Kings County, 196 Misc. 873, 95 N. Y. S. 2d 114; this was reversed by the Appellate Division for the Second Department with direction that the complaint be dismissed, 276 App. Div. 527, 96 N. Y. S. 2d 466, and the Court of Appeals affirmed the Appellate Division.   301 N. Y. 476, 95 N. E. 2d 806.   These pleadings and the opinions below are the basis on which we are asked to decide this case.

About forty plaintiffs brought the action initially; the trial court dismissed as to all but eight.   196 Misc., at 877, 95 N. Y. S. 2d, at 117–118.   The others were found without standing to sue under New York law.   The eight who are here as appellants alleged that they were municipal taxpayers and were empowered, by virtue of N. Y. Gen. Municipal Law § 51, to bring suit against municipal agencies to enjoin waste of funds.   New York is free to determine how the views of its courts on matters of constitutionality are to be invoked.   But its action cannot of course confer jurisdiction on this Court, limited as that is by the settled construction of Article III of the Constitution.   We cannot entertain, as we again recognize this very day, a constitutional claim at the instance of one whose interest has no material significance and is undifferentiated from the mass of his fellow citizens.  *Doremus* v. *Board of Education,* 342 U. S. 429.   This is not a "pocketbook action."   As taxpayers these plaintiffs cannot possibly be affected one way or the other by any disposition of this case, and they make no such claim.   It may well be that the authorities will, if left free, divert funds and effort

from other purposes for the enforcement of the provisions under review, though how much leads to the merest conjecture. But the total expenditure, certainly the new expenditure, necessary to implement the Act and Rules may well be *de minimis*. The plaintiffs at any rate have not attempted to show that any such expenditure would come from funds to which their taxes contribute. In short, they have neither alleged nor shown that our decision on the issues they tender would have the slightest effect on their tax bills or even on the aggregate bill of all the City's taxpayers whom th claim to represent. The high improbability of being able to make such a demonstration, in the circumstances of this case, does not dispense with the requirements for our jurisdiction. If the incidence of taxation in a city like New York bears no relation to the factors here under consideration, that is precisely why these taxpayers have no claim on our jurisdiction.

This ends the matter for plaintiffs Krieger and Newman. But six of the plaintiffs advanced grounds other than that of being taxpayers in bringing this action. Two are parents of children in New York City schools. Four are teachers in these schools. On the basis of the record before us these claims, too, are insufficient, in view of our controlling adjudications, to support the jurisdiction of this Court.

The trial court found the interests of the plaintiffs as parents inconsequential. 196 Misc., at 875, 95 N. Y. S. 2d, at 816. I agree. Parents may dislike to have children educated in a school system where teachers feel restrained by unconstitutional limitations on their freedom. But it is like catching butterflies without a net to try to find a legal interest, indispensable for our jurisdiction, in a parent's desire to have his child educated in schools free from such restrictions. The hurt to parents' sensibilities is too tenuous or the inroad upon rightful claims to public edu-

cation too argumentative to serve as the earthy stuff required for a legal right judicially enforceable. The claim does not approach in immediacy or directness or solidity that which our whole process of constitutional adjudication has deemed a necessary condition to the Court's settlement of constitutional issues.

An apt contrast is provided by *McCollum* v. *Board of Education*, 333 U. S. 203, where a parent did present an individualized claim of his own that was direct and palpable. There the parent alleged that Illinois imposed restrictions on the child's free exercise of faith and thereby on the parent's. The basis of jurisdiction in the *McCollum* case was not at all a parental right to challenge in the courts—or at least in this Court—educational provisions in general. The closely defined encroachment of the particular arrangement on a constitutionally protected right of the child, and of the parent's right in the child, furnished the basis for our review. The Feinberg Law puts no limits on any definable legal interest of the child or of its parents.

This leaves only the teachers, Adler, Spencer, and George and Mark Friedlander. The question whether their interest as teachers was sufficient to give them standing to sue was thought by the trial court to be conclusively settled by our decision in *United Public Workers* v. *Mitchell*, 330 U. S. 75. I see no escape from the controlling relevance of the *Mitchell* case. There individual government employees sought to enjoin enforcement of the provisions of the Hatch Act forbidding government employees to take active part in politics. The complaint contained detailed recitals of the desire, intent and specific steps short of violation on the part of plaintiffs to engage in the prohibited activities. See *id.*, at 87–88, n. 18. There as here the law was attacked as violating constitutional guaranties of freedom of speech. We found jurisdiction wanting to decide the issue except as to one

plaintiff whose conduct had already violated the applicable standards.

The allegations in the present action fall short of those found insufficient in the *Mitchell* case. These teachers do not allege that they have engaged in proscribed conduct or that they have any intention to do so. They do not suggest that they have been, or are, deterred from supporting causes or from joining organizations for fear of the Feinberg Law's interdict, except to say generally that the system complained of will have this effect on teachers as a group. They do not assert that they are threatened with action under the law, or that steps are imminent whereby they would incur the hazard of punishment for conduct innocent at the time, or under standards too vague to satisfy due process of law. They merely allege that the statutes and Rules permit such action against some teachers. Since we rightly refused in the *Mitchell* case to hear government employees whose conduct was much more intimately affected by the law there attacked than are the claims of plaintiffs here, this suit is wanting in the necessary basis for our review.

This case proves anew the wisdom of rigorous adherence to the prerequisites for pronouncement by this Court on matters of constitutional law. The absence in these plaintiffs of the immediacy and solidity of interest necessary to support jurisdiction is reflected in the atmosphere of abstraction and ambiguity in which the constitutional issues are presented. The broad, generalized claims urged at the bar touch the deepest interests of a democratic society: its right to self-preservation and ample scope for the individual's freedom, especially the teacher's freedom of thought, inquiry and expression. No problem of a free society is probably more difficult than the reconciliation or accommodation of these too often conflicting interests. The judicial role in this

process of accommodation is necessarily very limited and must be carefully circumscribed. To that end the Court, in its long history, has developed "a series of rules" carefully formulated by Mr. Justice Brandeis, "under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 346.

We have emphasized that, as to the kind of constitutional questions raised by the Feinberg Law, "the distinction is one of degree, and it is for this reason that the effect of the statute in proscribing beliefs—like its effect in restraining speech or freedom of association—must be carefully weighed by the courts in determining whether the balance struck by [the State] comports with the dictates of the Constitution." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 409. But as the case comes to us we can have no guide other than our own notions—however uncritically extra-judicial—of the real bearing of the New York arrangement on the freedom of thought and activity, and especially on the feeling of such freedom, which are, as I suppose no one would deny, part of the necessary professional equipment of teachers in a free society. The scheme for protecting the school system from being made the instrument of purposes other than a school system should serve in a free society—certainly a concern within the constitutional powers of a State—bristles with ambiguities which must enter into any constitutional decision we may make. Of these only a few have been considered by the courts below. We are told that an organization cannot be listed by the Regents except after hearing. 301 N. Y., at 488, 493, 494, 95 N. E. 2d, at 810–811, 814–815. From this it may be assumed that the hearing contemplated is that found wanting by some members of this Court in *Joint Anti-Fascist Refugee Committee* v. *McGrath,*

341 U. S. 123. The effect of the requirement that membership in a listed organization be prima facie evidence of disqualification in a dismissal proceeding is enlarged upon. 301 N. Y., at 494, 95 N. E. 2d, at 814–815. And the Court of Appeals indicates that only one who "knowingly holds membership in an organization named upon any listing" is subjected to the operation of that rebuttable presumption. *Id.*, at 494, 95 N. 꼬. 2d, at 814.

These are the only islands of clarity. Otherwise we are at sea. We are not told the meaning to be attributed to the words "treasonable or seditious" in §3021 of the Education Law, though that is one of the two sections of preexisting law which the elaborate apparatus of the Feinberg Law is designed to enforce. In light of the experience under the Sedition Act of 1798, 1 Stat. 596, "seditious" can hardly be deemed a self-defining term or a word of art. See Miller, Crisis in Freedom, 136–137. Nor can we turn to practical application or judicial construction for sufficient particularity of the meaning to be attributed to the range of activity proscribed by § 12–a. Concern over the latitude afforded by such phrases as "the overthrow of government by . . . any unlawful means" when positions of trust or public employment are conditioned upon disbelief in such an objective cannot be deemed without warrant. See *American Communications Assn.* v. *Douds,* 339 U. S. 382, 415, 435; *Garner* v. *Board of Public Works of Los Angeles,* 341 U. S. 716, 724. In those cases the Court had ground for limiting the reach of a dubious formula. No such alternative is available here.

These gaps in our understanding of the precise scope of the statutory provisions are deepened by equal uncertainties in the implementing Rules. Indeed, according to the Appellate Division these Rules are not in the case. 276 App. Div., at 531, 96 N. Y. S. 2d, at 471. And the Court of Appeals was silent on the point. Therefore we

are without enlightenment, for example, on the nature of the reporting system described by the Rules. This may be a vital matter, affecting not the special circumstances of a particular case but coloring the whole scheme. For it may well be of constitutional significance whether the reporting system contemplates merely the notation as to each teacher that no evidence of disqualification has turned up, if such be the case, or whether it demands systematic and continuous surveillance and investigation of evidence. The difference cannot be meaningless, it may even be decisive, if our function is to balance the restrictions on freedom of utterance and of association against the evil to be suppressed. Again, the Rules seem to indicate that past activities of the proscribed organizations or past membership in listed organizations may be enough to bar new applicants for employment. But we do not know, nor can we determine it. This, too, may make a difference. See *Garner* v. *Board of Public Works of Los Angeles, supra,* at 729 (Mr. Justice Burton dissenting in part). We do not know, nor can we ascertain, the effect of the presumption of continuing membership in proscribed organizations that is drawn from evidence of past membership "in the absence of a showing that such membership has been terminated in good faith." We are uninformed of the effect in law of the Commissioner's memorandum, and there is no basis on which to appraise its effect in practice. As for the order of the Board of Education of the City of New York, it is not even formally in the case. In the face of such uncertainties this Court has in the past found jurisdiction wanting, howsoever much the litigants were eager for constitutional pronouncements. *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450; *Congress of Industrial Organizations* v. *McAdory,* 325 U. S. 472; *Rescue Army* v. *Municipal Court,* 331 U. S. 549; *Parker* v. *County of Los Angeles,* 338 U. S. 327.

This statement of reasons for declining jurisdiction sounds technical, perhaps, but the principles concerned are not so. Rare departures from them are regrettable chapters in the Court's history, and in well-known instances they caused great public misfortune.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I have not been able to accept the recent doctrine that a citizen who enters the public service can be forced to sacrifice his civil rights.* I cannot for example find in our constitutional scheme the power of a state to place its employees in the category of second-class citizens by denying them freedom of thought and expression. The Constitution guarantees freedom of thought and expression to everyone in our society. All are entitled to it; and none needs it more than the teacher.

The public school is in most respects the cradle of our democracy. The increasing role of the public school is seized upon by proponents of the type of legislation represented by New York's Feinberg law as proof of the importance and need for keeping the school free of "subversive influences." But that is to misconceive the effect of this type of legislation. Indeed the impact of this kind of censorship on the public school system illustrates the high purpose of the First Amendment in freeing speech and thought from censorship.

The present law proceeds on a principle repugnant to our society—guilt by association. A teacher is disqualified because of her membership in an organization found to be "subversive." The finding as to the "subversive" character of the organization is made in a proceeding to which the teacher is not a party and in which it is not

---

*United Public Workers v. Mitchell, 330 U. S. 75; Garner v. Board of Public Works of Los Angeles, 341 U. S. 716.

clear that she may even be heard. To be sure, she may have a hearing when charges of disloyalty are leveled against her. But in that hearing the finding as to the "subversive" character of the organization apparently may not be reopened in order to allow her to show the truth of the matter. The irrebuttable charge that the organization is "subversive" therefore hangs as an ominous cloud over her own hearing. The mere fact of membership in the organization raises a prima facie case of her own guilt. She may, it is said, show her innocence. But innocence in this case turns on knowledge; and when the witch hunt is on, one who must rely on ignorance leans on a feeble reed.

The very threat of such a procedure is certain to raise havoc with academic freedom. Youthful indiscretions, mistaken causes, misguided enthusiasms—all long forgotten—become the ghosts of a harrowing present. Any organization committed to a liberal cause, any group organized to revolt against an hysterical trend, any committee launched to sponsor an unpopular program becomes suspect. These are the organizations into which Communists often infiltrate. Their presence infects the whole, even though the project was not conceived in sin. A teacher caught in that mesh is almost certain to stand condemned. Fearing condemnation, she will tend to shrink from any association that stirs controversy. In that manner freedom of expression will be stifled.

But that is only part of it. Once a teacher's connection with a listed organization is shown, her views become subject to scrutiny to determine whether her membership in the organization is innocent or, if she was formerly a member, whether she has bona fide abandoned her membership.

The law inevitably turns the school system into a spying project. Regular loyalty reports on the teachers must be made out. The principals become detectives; the

students, the parents, the community become informers. Ears are cocked for tell-tale signs of disloyalty. The prejudices of the community come into play in searching out the disloyal. This is not the usual type of supervision which checks a teacher's competency; it is a system which searches for hidden meanings in a teacher's utterances.

What was the significance of the reference of the art teacher to socialism? Why was the history teacher so openly hostile to Franco Spain? Who heard overtones of revolution in the English teacher's discussion of the Grapes of Wrath? What was behind the praise of Soviet progress in metallurgy in the chemistry class? Was it not "subversive" for the teacher to cast doubt on the wisdom of the venture in Korea?

What happens under this law is typical of what happens in a police state. Teachers are under constant surveillance; their pasts are combed for signs of disloyalty; their utterances are watched for clues to dangerous thoughts. A pall is cast over the classrooms. There can be no real academic freedom in that environment. Where suspicion fills the air and holds scholars in line for fear of their jobs, there can be no exercise of the free intellect. Supineness and dogmatism take the place of inquiry. A "party line"—as dangerous as the "party line" of the Communists—lays hold. It is the "party line" of the orthodox view, of the conventional thought, of the accepted approach. A problem can no longer be pursued with impunity to its edges. Fear stalks the classroom. The teacher is no longer a stimulant to adventurous thinking; she becomes instead a pipe line for safe and sound information. A deadening dogma takes the place of free inquiry. Instruction tends to become sterile; pursuit of knowledge is discouraged; discussion often leaves off where it should begin.

This, I think, is what happens when a censor looks over a teacher's shoulder. This system of spying and

surveillance with its accompanying reports and trials cannot go hand in hand with academic freedom. It produces standardized thought, not the pursuit of truth. Yet it was the pursuit of truth which the First Amendment was designed to protect. A system which directly or inevitably has that effect is alien to our system and should be struck down. Its survival is a real threat to our way of life. We need be bold and adventuresome in our thinking to survive. A school system producing students trained as robots threatens to rob a generation of the versatility that has been perhaps our greatest distinction. The Framers knew the danger of dogmatism; they also knew the strength that comes when the mind is free, when ideas may be pursued wherever they lead. We forget these teachings of the First Amendment when we sustain this law.

Of course the school systems of the country need not become cells for Communist activities; and the classrooms need not become forums for propagandizing the Marxist creed. But the guilt of the teacher should turn on overt acts. So long as she is a law-abiding citizen, so long as her performance within the public school system meets professional standards, her private life, her political philosophy, her social creed should not be the cause of reprisals against her.