Bubke, J. (dissenting).
The Commissioner of Education does not have the power to approve a code of behavior which, by a conspiracy of silence, has frustrated the investigation into subversion in the school system in New York City — a school system which educates almost 1,000,000 children, and has a staff of over 40,000 teachers. The validity of the Commissioner’s decision according to his brief depends entirely on assumptions, inferences, speculations, polls, commentators’ opinions, editorial comment and bare conclusions. Facts and legal precedents are conspicuously absent.
The Commissioner’s ruling, which prevents the New York City Board of Education from discharging or suspending employees with Communist backgrounds who have refused, when questioned, to identify school personnel known by them to have been Communists, seems to have been influenced by arguments made by the respondent teachers and other interested parties. Recognizing the deficiencies of these argu *143 ments, however, the Commissioner has attempted to sustain the validity of his determination on his alleged absolute power in matters of “ educational policy ” (Education Law, § 310) when it was subjected to the scrutiny of the courts. Since this court must judge the propriety of administrative action solely on the grounds invoked by the administrative agency (Matter of Barry v. O’Connell, 303 N. Y. 46, 50), they deserve the full consideration of the court.
The respondent teachers rely on Watkins v. United States (354 U. S. 178 [labor leader]), Sweezy v. New Hampshire (354 U. S. 234 [university professor]), and Konigsberg v. State Bar (353 U. S. 252 [law student]) as authorities supporting their right to remain silent when questioned concerning the identity of persons whom they knew to be Communists.
The kind of ‘ ‘ right to silence ’ ’ adverted to in the cases cited by the respondent teachers is not involved in this case. The right to remain silent exists only where there is no corresponding duty to speak. Here the teachers assert not only their right to remain silent, but also assert that, despite their silence, they are to remain in public employment. Their position has been approved by the Commissioner. Administrative fiat has created a subsidy for those who assert the right to silence at the expense of the taxpayers of this State. The People who pay the piper, apparently, are no longer able to call the tune. Indeed, the piper, who refuses to play any tune at all, insists upon being paid nevertheless.
To date, however, the United States Supreme Court has not found that those partaking of the “ right to silence ” in subversion cases must be subsidized by the government or by agencies of the government. On the contrary, the Supreme Court has clearly decided that a teacher has to choose between his job and his proscribed associations. (Adler v. Board of Educ., 342 U. S. 485.) 11 By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness, candor and cooperation in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher.” (Beilan v. Board of Educ., 357 U. S. 399, 405; see, also, Matter of Lerner v. Casey, 2 N Y 2d 355, affd. 357 U. S. 468.) A person does not have a con *144 stitutional right to governmental employment and, once a position is accepted, he must comply with reasonable, lawful and nondiscriminatory terms laid down by proper authorities. (United Public Workers v. Mitchell, 330 U. S. 75; Oklahoma v. Civil Service Comm., 330 U. S. 127; Adler v. Board of Educ., 342 U. S. 485, supra; Slochower v. Board of Educ., 350 U. S. 551, 555.) A person who persists in his personal convictions does so at the risk of his public employment. (Garner v. Los Angeles Bd., 341 U. S. 716; Adler v. Board of Educ., 342 U. S. 485, supra.)
The right to silence, I have pointed out, does not exist where there is a duty to speak. The teachers here owe to the people of this State the duty to reveal their knowledge and information to duly constituted authorities. In New York, for some years, we have had a public policy that subversives were not to be appointed or retained in positions of public employment (Civil Service Law, § 12-a; Education Law, § 3022; Rules of Board of Regents, § 244, subd. 1, par. a; subd. 2; see Matter of Adler, 73 N. Y. St. Dept. Rep. 134, Commissioner of Educ. 195; Matter of Adler v. Wilson, 282 App. Div. 418, motion for leave to appeal denied 306 N. Y. 981). In New York City the local Board of Education has, by virtue of provisions of section 526 of the New York City Charter, the right to require any and all persons under its jurisdiction to make known to it all information within their knowledge respecting the conduct of any of its members and employees and to impose penalties for failure to disclose this information. The failure to discharge this duty casts serious reflection upon a person’s fitness to hold a position of responsibility as a teacher.
The Commissioner agrees that questions concerning a person’s knowledge of other individuals who had espoused communism are proper in the inquiry undertaken by the Board of Education. But he holds that the failure to answer these questions provides no ground for disciplinary action, and serves no basis for an inquiry into a teacher’s fitness to practice his profession. The issue in this case then is whether the Commissioner of Education can immunize former Communist teachers for penalties for contemptuous conduct in refusing to identify employees of the school system known to them to be or to have been Communists.
*145 In order to resolve the issue, it is necessary to consider the problem which confronted the school board, the authority vested in the local school board by the Legislature and the Board of Regents, and the actual extent of the relief granted to the defendants by the Commissioner.
Prior to the Commissioner’s decision, 186 members of the school system were identified as Communists. One hundred and twenty-five of those persons so identified were separated from the school system. The remaining 61 who admitted former membership were retained in the employ of the board. Ninety-four Communists were removed from the employ of the Board of Higher Education. At the time of the Commissioner’s ruling there were 28 employees, including the 5 defendants here, admitted former Communists, who had refused to disclose the identity of other school employees whom they acknowledge had been members of the Communist party. The contention of the petitioner that these employees could name more than 500 employees of the board who had been members of the Communist party is unchallenged. There are, presently unknown, persons who might have been members of the Communist party, and have knowledge of other employees who had been or still are members. Thus there are and were many employees who were or are members of the Communist party cells in various schools who have not been touched by the board’s investigation. The employment, of course, of all such persons may be contrary to the provisions of the law (Civil Service Law, § 12-a; Education Law, § 3022) and the Rules of the Board of Regents (§ 244, subd. 1, par. a; subd. 2).
The preamble to the Peinberg Law (Education Law, § 3022) indicates legislative dissatisfaction as to the actions on the part of the educational authorities in removing subversives from positions in the educational system. (L. 1949, eh. 360, § 1.) The law itself authorized procedures better to achieve this end. But the Legislature had not indicated the methods to be employed by the local boards in ferreting out subversives from these highly sensitive areas.
By the Rules of the Board of Regents, the petitioner was authorized to “ inquire of prior employees and such other persons as may be in a position to furnish pertinent information ” as to subversion.
*146 By what authority, then, did the Commissioner enjoin the petitioner from enforcing a legal, generally accepted and effective method of inquiry, patently essential for carrying out the legislative mandate and the Rules of the Board of Regents, to expose and rid the school system of subversives ? Certainly, the Legislature and the Board of Regents did not empower the Commissioner of Education to limit the methods of inquiry. This power had not been granted to him by statute; it has not been conferred upon him by the State Constitution. In short, the power to determine whether a particular type of questioning will do more harm than good is not within the scope of the Commissioner’s delegated authority.
No argument is necessary to show that the administrative determination has effectively shielded from exposure a very large number of persons who are or have been Communists. The right to thus thwart a legislative-mandated investigation is derived, the Commissioner claims, from his power to determine educational policy. The institution of the method of inquiry adopted by the petitioner would wreck, he states, the morale of the school system because it would be an “ inquisition ” requiring teachers to be “ informers ” and would probably result in the defamation of innocent persons. Nevertheless, at Special Term, he stated that his decision authorized the board to conduct unlimited questioning of admitted former Communists concerning the identity of other present employees whom they knew to be party members (inquisition) and allowed those questioned to answer and identify those persons (informers), and permitted the board to use any information gained from the witnesses through such questioning.
It is clear, then, that the Commissioner made no determination in respect to educational or school policy for the protection of the school system, because he concedes, as he must (Education Law, § 3022; Rules of Board of Regents, § 244, subd. 1, par. a; subd. 2), that the board had the right to utilize the method of inquiry, but he forbids its enforcement only to the extent of upholding those who refuse to answer.
The decision, then, was concerned solely with protecting from discipline the individual defendants under investigation who because of their personal convictions refused to identify others. Such a decision is completely unrelated to educational policy *147 of the school system. The ruling consisted exclusively of an illegal attempt to grant a privilege to employees of the board, admitted former Communists, to refuse to answer proper relevant and pertinent questions during a State-mandated investigation into subversion with complete immunity from penalty for such refusal. It should not be necessary to point out that directors of governmental agencies cannot usurp the exclusive power delegated by the People to their legislators to establish privileges and immunities. The Commissioner’s action here is an unwarranted assumption and exercise of legislative power.
As the Commissioner lacks the power which he purports to exercise, we should set aside his action. (Matter of Ross v. Wilson, 308 N. Y. 605; Matter of Eaton v. Allen, 1 Misc 2d 496.)
But even assuming, arguendo, that the Commissioner’s decision thwarting a legislative-mandated inquiry into subversion in our public school system is based upon educational policy, this court should set it aside as purely arbitrary and capricious. (Matter of Levitch v. Board of Educ., 243 N. Y. 373, 375.) We must decide then whether precedent and reason support the Commissioner’s determination.
There can be no doubt that the means utilized by the New York City Board of Education—namely, the requiring a teacher or professor to reveal the names of those persons in the educational system whom he knows to be a member of a subversive organization—is entirely proper. As early in our common-law jurisprudence as 1612, Lord Bacon recognized the obligation of all citizens to facilitate judicial inquiry by disclosure, (Countess of Shrewsbury’s Case, 2 How. St. Tr. 769, 778, cited in Blair v. United States, 250 U. S. 273, 279.) The United States Supreme Court has upheld contempt citations where a person refused to disclose the names of others whom she knew to be Communists (Yates v. United States, 355 U, S. 66; cf. United States v. Costello, 198 F. 2d 200, cert, denied 344 U. S. 874). A newspaper woman was similarly detained under an order of contempt in refusing to disclose in a civil action the name of a person which would have assisted the court in its investigation. (Garland v. Torre, 259 F. 2d 545, cert, denied 358 U. S. 910.) Only recently this court has upheld *148 the incarceration of the Apalachin visitors for their refusal to answer truthfully questions relevant to an official investigation. (Matter of Commission of Investigation v. Lombardozzi, 5 NY 2d 1026.)
These cases clearly indicate that the Commissioner’s determination that the refusal to answer the questions posed can form no basis for disciplinary action is purely arbitrary. There may be, it is true, other and better ways of attaining the information required by the board, but if the board does not exceed the bounds of reasonableness—and clearly here it did not—it is an arbitrary act on the part of the Commissioner to proscribe disciplinary action for refusal to respond to this line of questioning. ‘ ‘ A witness, of course, cannot ‘ pick and choose ' the questions to which an answer will be given.” (Yates v. United States, 355 U. S. 66, 73, supra.)
The identification of several hundred employees in the New York City school system as Communists and former Communists as well as the uncontradicted estimate that there are more than 500 other employees in the system who are or have been members of the Communist party emphasizes the materiality and the importance of the evidence the Board of Education seeks to obtain. There is no evidence or authorization in the decided cases to support the generalization that the testimony of so-called “ informers ” is of little value. There is abundant evidence that such an assumption is contrary to fact. To date 125 school personnel identified as one-time Communists by former party members presently employed in the school system resigned or retired rather than submit to questioning or were removed. No employee so identified has ever contended that he was falsely accused of being a Communist or former Communist. Testimony of so-called ‘1 informers ” in conspiracy cases has been accepted by juries to convict and this court and the United States Supreme Court have repeatedly held that such testimony was an adequate basis for the conviction. (See People v. Luciano, 277 N. Y. 348 [1938], reargument denied 278 N. Y. 624 [1938], cert, denied 305 U. S. 620 [1938]; People v. Hines, 258 App. Div. 466 [1st Dept., 1940], mod. 284 N. Y. 93 [1940]; People v. Fay, 270 App. Div. 261 [1st Dept., 1945], affd. 296 N. Y. 510 [1946], affd. 332 U. S. 261 [1947]; People v. Gross, 279 App. Div. 930 [2d Dept., 1952], *149 affd. 304 N. Y. 789 [1952]; Dennis v. United States, 341 U. S. 494 [1951], rehearing denied 342 U. S. 842 [1951]; United States v. Hiss, 185 F. 2d 822 [C. A. 2d, 1950], cert, denied 340 U. S. 948 [1951]; United States v. Rosenberg, 195 F. 2d 583 [C. A. 2d, 1952], cert. denied 344 U. S. 838 [1952].)
The Commissioner has sustained dismissals of teachers in the past, on the basis of such information, and has recently upheld the dismissal of a professor who was identified by a colleague as a member of the Communist party. (Matter of Board of Higher Educ. v. Austin, Commissioner of Educ., No. 6603, May 13, 1959.)
The disproven speculations of the Commissioner illustrate how he, without any evidence or precedent, attempts to rule on matters far beyond the realm of educational policy.
The appellants’ brief shows that “ The record is also completely devoid of any proof that the Board has been guilty of ‘ indiscriminate ’ use of this method of inquiry.” The investigation and interrogation of these defendants and of all other persons under inquiry have at all times “ been conducted in private without public disclosure as to the substance of the information [furnished] or the identity of alleged subversive persons.” For example, each of the defendants was advised that the interviews were completely confidential and would be in no way publicized.
“All information” obtained during the investigations has at all times “ been carefully considered ” and evaluated “ with respect to credibility, weight and relevancy and no charges and specifications have [ever] been filed or prosecuted * * *
unless and until in the judgment of the Superintendent of Schools such charges and specifications were ” warranted by the facts.
Finally the assertions of alleged damage to the school system are squarely contradicted by the Commissioner’s position in limiting the obligation of the principal to identification of present members of the Communist party employed in his school. This position presents several questions. In the words of the appellant: “Is the report of a former Communist principal worthy of belief merely because it is prepared by a principal rather than a former communist teacher? * * * Why [is] a principal, once tainted %oith communism, * * * *150 credible but a teacher, similarly tainted, untrustworthy\_f\ Is the report reliable with respect to present Communist Party membership of employees in the principal’s school but not reliable in respect to past membership of employees under his jurisdiction or to present and past membership of employees in other schoolsf ”
The Commissioner’s opinion, as appellant proves, “contains an illogical application of the theory that possible injury to the school system justifies the prohibition of a legal and essential method of inquiry. Thus the Commissioner excuses teachers from their concededly legal duty to answer questions by asserting that damage to the school system might result. However, a principal is excused from only part of this duty and is required to name names within a defined area although the possible alleged injury to the system is the same.
“It is obvious that the duty of the Board to comply with the Legislative mandate could not be dependent upon the fortuitous circumstances and vagaries of school assignments instead of the duty of members of the teaching profession to cooperate with lawfully constituted authority. ’ ’
The distinction made between the teachers and the principal of a school in the Commissioner’s ruling is difficult to understand. The difficulty is compounded when we read the Commissioner’s ruling requiring a college professor to answer questions concerning statistical information on subversive organization—and makes his refusal to answer subject him to disciplinary action—but holds sacrosanct his refusal to answer questions concerning the names of persons whom he knew to be Communists.
Even if we were to assume that the discharge of the statutory duty may have some harmful effect, the Legislature must be deemed to have foreseen all of the consequences and concluded that the benefits outweigh the possible ill effects. This expression of policy is contained in the statement of findings accompanying the enactment of the Feinberg Law wherein it stated in part: ‘ ‘ The legislature further finds and declares that in order to protect the children in our state from such subversive influence it is essential that the laws prohibiting persons who are members of subversive groups, such as the communist Party and its affilated organizations, from obtaining or retain *151 ing employment in the public schools, be rigorously enforced. The legislature deplores the failure heretofore to prevent such infiltration which threatens dangerously to become a commonplace in our schools. To this end, the board of regents, which is charged primarily with the responsibility of supervising the public school systems in the state, should be admonished and directed to take affirmative action to meet this grave menace and to report thereon regularly to the state legislature”. (L. 1949, ch. 360, § 1.)
In Matter of Adler v. Wilson (282 App. Div. 418, 425, motion for leave to appeal denied 306 N. Y. 981), the court said in connection with the Board of Begents’ 1951 policy declaration: “ It states a policy but it purports to add nothing to powers of inquiry and investigation already resident in local school authorities.”
It is, therefore, apparent that the board had the right to adopt a legal method used and recognized as essential by all law enforcement agencies, and did not need any specific authorization from the Legislature or the Board of Begents.
Since the alleged reasons of the Commissioner are self-contradictory, purely speculative and contrary to the facts and decisional law, his conclusions lack a rational basis.
The obligation of teachers to co-operate fully with their employer in enforcing a public policy of this State should not be considered less than that of any other citizen but greater. Befusal to co-operate seriously reflects upon their ability and capacity to hold a position of trust and confidence. (See Matter of Lerner v. Casey, supra.)
Accordingly, the orders of the Appellate Division should be reversed, and the determinations of the Commissioner of Education be vacated.
Judges Desmond, Dye, Fuld, Froessel and Van Voorhis concur with Chief Judge Conway; Judge Btjrke dissents in an opinion.
Orders affirmed.