Irving H. Saypol, J.
This application (CPLR, art. 78) was heard by the court during the recent strike of New York City Transit Authority (Authority) employees. Transportation facilities came to a halt New Year’s morning January 1, 1966. Operations resumed after January 13. Petitioner asks for an order restraining, prohibiting and enjoining as illegal the offering or paying by the respondents to the strikers of any amount in excess of their compensation in effect prior to the strike on January 1, 1966, for at least three years after resumption of their re-employments (Civil Service Law, § 108 — the Condon-Wadlin Law). The respondents (at the argument the added Municipal Civil Service Commission [Commission] and *172 its individual members were joined on consent), cross-moved before answer to dismiss the petition by raising objections in point of law. Counsel for representatives of the striking employees were heard, amici curice, in support of the respondents’ cross motions to dismiss.
The cross motions are denied, and the respondents may serve and file their answers within 10 days of the service of a copy of the order hereon with notice of entry (CPLR 7804, subd. [f]).
There are significant truths to be reminded and remembered here. Important public policy is involved. That public policy is inherent in the common law and written into the Constitution of the State of New York, expressly prescribed in the implementing Civil Service Law and uniformly sustained in judicial decisions and by impressive official opinion against striking the government by public employees. It is illumined in the excerpted appendices at the foot of this opinion. These include quotations from the Civil Service Law, from court holdings of New York courts and other States and the Supreme Court of the United States. The memorandum of strong approval by Governor Thomas E. Dewey in 1947 on signing the original Condon-Wadlin bill (L. 1947, ch. 391, now Civil Service Law, § 108) is a good summarization of comparable declarations by Presidents Roosevelt and Truman, Governor Rockefeller, Mayors La Guardia and Wagner against the offense. (City of New York v. Social Serv. Employees’ Union, 48 Misc 2d 820.) Its provisions remain unchanged except for so-called easing of the penalties in the temporary interval between April 23, 1963 and July 1,1965 (L. 1963, ch. 702).
When applied, the distinctive provisions of section 108 in the background of the stated public policy, in its own context, the legislative symmetry and juxtaposition, distinguishably when considered with other provisions of general application covering employee misconduct, there emerges a convincing tri-dimensional perspective of its need and force.
The .supreme law in the Constitution of the State of New York (art. V, § 6) together with its implementing Civil Service Law proclaims the public policy which controls the whole civil service, to promote the good of the public service (People ex rel. Kastor v. Kearny, 164 N. Y. 64). The duty rests upon the Legislature and the courts to enforce those civil service provisions in letter and spirit (Chittenden v. Wurster, 152 N. Y. 345).
Preliminarily, it is a prerequisite to public office or employment to swear on oath or affirmation both to support the Federal and State Constitutions and to faithfully discharge the duties *173 of office or employment (N. Y. Const., art. XIII, § 1; Civil Service Law, § 62). As already stated, generally, provisions for removal and discipline for misconduct of civil service employees is found in title B of article 5 of the Civil Service Law (§§ 75-77). The charges must be in writing, an opportunity to answer and a hearing must be afforded. The burden of proving the charges is on the accuser. When proved, punishment can be reprimand, a fine not to exceed $100 to be deducted from salary or wages, suspension without pay not to exceed two months, demotion in grade or title, or dismissal. Review is afforded, either by appeal to the Civil Service Commission or to the court.
Employee misconduct by striking however is dealt with separately and specially, in conjunction with subversion and treason (Civil Service Law, art. 7, tits. A, B, C, §§ 95-108, entitled " Enforcement; Prohibitions; Penalties ”, annexed appendix, infra).
Interrupting here, before examining the provisions of section 108, both its own context and also its physical location as part of the statutory structure, it is fit to be reminded of the effects of the strike, that is to view the statute for application.
The truth of the allegations about the strike is admitted by the cross motions. Its occurrence, its duration and some of its effects are common knowledge. The court knows itself that its operations in and out of the courtroom were practically halted because of the hardship on personnel and participants. The court knows too that New York City where the rush-hour has been characterized as that period when traffic comes to a standstill, together with its environment, really stood still. The judicially noticed records of the court show the issuance of injunctions pendente lite enjoining the strike (New York Tr. Auth. v. Quill, 48 Misc 2d 940, and Manhattan and Bronx Surface Tr. Operating Auth. v. Quill, 48 Misc 2d 1021); the decision in the proceeding by Authority adjudging and punishing civil contempts, for defiance of the court’s orders (N. Y. L. J., Jan. 5, 1966, p. 16, col. 7 [Geller, J.]); then the release from jail of the contemnors on Authority’s urging that the contemn or s had purged their offensive disdain of the court’s orders by ordering the ending of the strike (N. Y. L. J., Jan. 14, 1966, p. 14, col. 1 [Geller, J.]). The court also notes the opinion of Geller, J., in the action of Gilmartin v. O’Grady (N. Y. L. J., Jan. 18, 1966, p. 16, col. 3) on granting the order to show cause in the new action by the strikers and their representatives attacking the law, particularly the penalties.
In this proceeding, in the affidavit of Authority Chairman Joseph E. O’Grady, for himself and on behalf of his fellow *174 Commissioners John J. Gilbooley and Daniel T. ,Scanned, first describing the herculean efforts to restore transit service, Chairman O’Grady continues as .follows in describing the terrible situation: “ 6. The complete shut-down of all public transit facilities in this City has brought untold hardship to its millions of inhabitants. The inconvenience suffered by the public attempting to find other means of travel to their place of business ; the possible loss of wages by those unable to get to work, which is particularly onerous to those in the lower economic levels; the congested and hazardous traffic conditions, especially at bridges, tunnels and on parkways, are some of the hardships suffered by individuals. In addition, the economic loss to the business community is equally incalculable. It has been reported that these losses are as much as $100,000,000 a day. No such economic disaster has occurred since the Depression of the Thirties, and the financial burden is particularly difficult for the small businessman, who operates on a narrow margin of profit.” .This was the public reaction:
The transit strike dealt New York City’s economy a staggering blow.
As the shutdown dragged on, impact of the strike was felt throughout the U. S., as well.
Business losses during the 12-day shutdown of subways and buses were estimated at 800 million dollars in New York City.
Losses to wage earners unable to get to their jobs were figured at upward of 25 million dollars a day. The loss of an estimated 500 million man-hours per week severely crippled industry, commerce and banking.
The New York City Commerce and Industry Association called the strike and its effects “the worst economic catastrophe since the great depression” of the 1930s.
¡Ralph Gross, the association’s executive vice president, pointed out that the paralysis in New York’s business operations affected production, marketing and finance, causing a slowdown felt across the country. Mr. Gross said that the' delicately balanced economy was “ wrenched out of plumb by this irresponsible strike, causing great loss to millions of people.”
Some examples of how the strike affected businesses in other cities —
With New York’s garment industry direly affected at what normally would be a time of peak production, department stores and dress shops all over the U. S. were caught short. About 75 per cent of garment-industry workers were absentees. Some plants closed.
Major trucking lines which link New York with other cities reported that the pickup and delivery situation was so chaotic that shippers and buyers everywhere were hurt.
Out-of-town banks and brokerage houses experienced serious delays in completing financial transactions with New York. The Federal Reserve System reported that cheeks in process of collection declined by 347 million dollars on an average day during the strike.
Some typical losses in New York City —
'The Equitable Life Assurance Society of the U. S. estimated its losses at 2 million dollars a week, including costs of paying employees who were kept away by the strike. Many employers, however, adopted a “no show, no pay” policy.
*175 Newspapers took a financial beating. “The New York Times” said that it lost nearly a half million dollars in advertising. Other newspapers also reported heavy losses. Retail advertising, particularly, was sharply curtailed.
Department stores reported heavy losses and small businesses were in severe straits. One example: The proprietor of a greeting-card shop on Manhattan’s East Side said that sales totaled 25 cents on a day when they normally would be $200. Neighborhood stores across the city said that business was off 25 to 80 per cent.
Small firms facing financial ruin rushed to get loans from the Small Business Administration under emergency action ordered by President Johnson. Field offices were set up in the five boroughs to handle thousands of applications.
Among the 300 of the nation’s 500 leading firms which maintain corporate headquarters in New York, absenteeism of executives slowed decision making. Executives from out-of-town cancelled attendance at important meetings scheduled in New York.
Many employers — including such men as an official of a concern with yearly sales in the billions of dollars — talked of moving away from New York at the first opportunity.
A bleak prediction by Mark Richardson, executive vice president of the New York City Chamber of Commerce:
“ The long-range effects of the strike, I feel, will be much worse than the immediate effects. With New York manufacturers unable to fill orders, out-of-town merchants are turning to manufacturers in other cities to supply them. Once they’ve got the foot in the door you can be sure those manufacturers will try to hold on to the business.” (U. S. News & World Report, Jan. 24, 1966.)
Still in preface, it is well remembered here William Pitt’s declamation — where law ends-, tyranny begins — in the House of Lords two hundred years ago in the defense of John Wilkes. To this, in supportive complement, is the purely coincidental observation of Associate Judge Francis Beegan of the Court of Appeals on the eve of the strike. *1 A government is bound at all costs to enforce its commands if it hopes to preserve public order. If the community gives notice by neglect and long inaction that it will make no effort to enforce the law * * * it invites both violations and a general refusal to * * * [obey the law] * * * the failure to enforce judicial mandates * * * [by inertia or inaction or compromise on the part of those who .seek and obtain the court’s order] affects judicial policy significantly and is a concern and responsibility of this court.” (People v. Letterio and People v. Kohler, 16 N Y 2d 307, 314, concurring opn.; cf. Hamm v. City of Rock Hill, 379 U. S. 306, 328, dissenting opn. White, J.; cf. Forman v. City of Montgomery, 245 F. Supp. 17, 24-25, Johnson, J.)
Section 108 is the last section in article 7 of the Civil Service Law; headed ‘ ‘ Enforcement; Prohibitions; Penalties ’ ’. Article 7 is subdivided into title A, entitled in part, ‘ Duties of Public Officers ” sections 95 to 97, title B, entitled “ Certification of *176 Payrolls; Court Actions, ’ ’ sections 100 to 102 and title C, entitled “ Prohibition Against Certain Activities by Officers and Employees; Penalties,” sections 105 to 108.
After defining and prohibiting the strike (Civil Service Law, § 108, subds. 1, 2, 3), it is provided that, notwithstanding any other law (presumably section 75 dealing with misconduct and discipline generally), violation constitutes abandonment and termination of employment, rights and emoluments, conditioned that (subd. 4) such a person may be re-appointed, etc., but only with no higher pay than received at the time of the violation (subd. 5, par. [a]) and not to be increased until after three years (subd. 5, par. [b]), and remaining on probation without tenure — a temporary employee subject to summary dismissal— for five years (subd. 5, par. [c]). It is apparent that guilt is presumed, the penalty extreme except that there can be partial absolution but with the stated sanctions. It may be noted here that in the Federal service the assertion of the right to strike is coupled with disloyalty, results in forfeiture of employment, disqualification for future employment and it is a criminal offense (U. S. Code, tit. 5, § 118p, subd. [3], “ Federal employment denied persons who are disloyal or assert right to strike against Government ”). Separate provision is made in section 108 for the person who professes his innocence. Again stating a presumption that failure to report for duty or total or partial abstention from performance constitutes striking, etc., notwithstanding any other provision of law, a person shall be entitled to establish that he did not violate by making written request within 10 days after cessation of compensation; whereupon the employer — officer or body — shall within 10 days institute a proceeding patterned on a removal proceeding (again Civil Service Law, § 75) for determination of violation.
The validity of the statute, constitutional and otherwise, has withstood frequent attack, particularly in the case of employees of the Authority (New York City Tr. Auth. v. Loos, 2 Misc 2d 733 [Sup. Ct., New York County, Vincent A. Lupiano, J.], affd. 3 A D 2d 740). The law has been sustained as to teachers (Pruzan v. Board of Educ. of City of N. Y., 25 Misc 2d 945 [Sup. Ct., New York County, Jacob Markowitz, J.], direct appeal on constitutional ground dismissed 9 N Y 2d 680, Special Term affd. 12 A D 2d 923, affd. 9 N Y 2d 911). There are other holdings to the same effect in this court (see City of New York v. Social Serv. Employees’ Union, N. Y. L. J., Jan. 19, 1965, p. 15, col. 5, and 48 Misc 2d 820). The excerpted opinions in the appendix likewise uphold similar statutes in sister States and particular attention is directed to the Detroit case (supra, *177 appendix) in which the Supreme Court of Michigan upheld its statute, a close parallel to ours, involving transit employees. It will be noted that the Supreme Court denied review twice.
Examination of the whole pattern of the legislative scheme indicates the special and separate treatment for striking. In the reference to the Federal statute (supra), it is seen by its title that Congress paired it with disloyalty. Looking backwards from section 108 through title C of article 7, it is seen that its first section 105 deals with both disqualification for and dismissal from public employment for subversion. Here, too, there is presumption. So that subversion and striking are equated, given special treatment with provision for summary discipline. The Supreme Court of the United States, in the majority opinion upholding the validity of former section 12-a of the Civil Service Law, from which section 105 is derived, as complemented by the Feinberg Law (Education Law, § 3022) stated: “ It is clear that such persons have the right under our law to assemble, speak, think and believe as they will. Communications Assn. v. Douds, 339 U. S. 882. It is equally clear that they have no right to work for the State in the school system on their own terms. United Public Workers v. Mitchell, 330 U. S. 75. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere ” (Adler v. Board of Educ., 342 U. S. 485, 492, affg. 301 N. Y. 476, affg. 276 App. Div. 527, revg. 196 Misc. 873).
The Supreme Court in that case expressly approved the holding of our Court of Appeals which sustained the validity of that part of section 3022 of the Education Law, which makes membership in an organization listed as subversive after notice and hearing, prima facie evidence of disqualification. That is a presumption akin to presumption of violation in striking as expressed in subdivisions 4 and 6 of section 108. In so holding the Supreme Court quoted at length from the opinion in the Court of Appeals (301 N. Y. 476, 494). In short, the hearing afforded by subdivision 6 supplies the constitutional procedural due process requirement.
Looking back further in the statutory scheme of article 7, attention is focused on the obligations which are imposed on public officers — the respondents, their duties, their obligations, the strictures and personal liabilities and penalties for their violations of the Civil Service Law.
It is the duty of all public officers — each of the individual respondents— to comply with and to aid in all proper ways in *178 carrying into effect the Civil Service Law. They must make no appointments or re-appointments except according to the Civil Service Law. For appointments contrary to Civil Service Law, the officer will pay the appointee the agreed or reasonable compensation plus the costs of an action created for the employee, and moreover there shall be no reimbursement out of the public treasury (Civil Service Law, art, 7, tit. A, § 95).
Detailed reports of employment including compensation etc., .service and termination must be made by the appointing officer to the Municipal Civil Service Commission. This Commission shall maintain an official roster of employment showing in detail the employment history of each employee, showing each change of status or compensation from the time he enters service until he separates from service (Civil Service Law, art. 7, tit. A, § 97).
Title B of article 7 of the Civil Service Law (§§ 100-102) sets forth a minutely detailed system of requirements for insuring that compensation shall not be made except for work to appointees who are employed in accordance with the Civil Service Law. No disbursing or auditing officer shall approve or pay or have any part in approving or paying salary unless the payroll or voucher bears the certificate of the Civil Service Commission. It is obligatory upon the Commission to advise disbursing and paying officers of violative employments. Such advice makes it mandatory not to pay. Failure within 30 days to certify by the Commission is presumptive evidence in any action against the paying officer for the benefit of the public treasury, as authorized by section 102 (§ 100, subd. 1, pars, [a], [b]).
Willful payment of compensation or authorization therefor by any officer with knowledge of refusal of Commission certification or after its notice that reinstatement is in violation of the Civil Service Law is a misdemeanor (§ 101).
Three kinds of court action in aid of enforcement of the Civil Service Law are authorized (art. 7, tit. B, § 102, court proceedings):
1. A taxpayer’s action to declare illegal or restrain payment prospectively of compensation in a specific ease of violation of the law.
2. A taxpayer’s action or one by the Commission against offending officers, appointing, signing or countersigning, etc., warrants for unlawful compensation, and also establishing liability against their sureties, for the benefit of the public treasury. The appropriate law officer of the particular .subdivision must prosecute the suit on demand.
*179 3. An action by the Commission to enjoin any violation, again mandatorily to be prosecuted by the law officer upon the request of the Commission.
Mayor John V. Lindsay, the City of New York and the Comptroller of the City of New York move on the affidavit of J. Lee Rankin, Corporation Counsel, for an order dismissing the petition upon the ground that it fails to state facts sufficient to warrant the relief sought. In his affidavit the Corporation Counsel shows that the New York City Transit Authority is a State body. He contends that it is independent of the city government in its operation of transportation facilities (Public Authorities Law, § 1202), it is empowered to appoint its employees and fix their compensation (id., § 1204, subd. 6), over which the city officials have neither power nor authority. This point can have no application to the City Civil Service Commission, initially not named as respondent but later joined on consent. It belongs in the ease in any event.
The city and its named officials are proper parties because of the interrelation between the city and the Authority pursuant to several provisions of law.
Title 9 of the Public Authorities Law (New York City Transit Authority, §§ 1200-1221) in its opening section 1200 includes by definition the city Board of Estimate, the City of New York, its •Comptroller and its Mayor. The Mayor appoints one of the three members of the Authority (id., § 1201). It is a governmental agency performing a beneficial function for the People of the State of New York in the operation of the city’s transit facilities on a self-sustaining basis, exclusive of capital costs (id., § 1202). Capital costs are paid by the city, involving the usual routine for inclusion in the city’s budget on submission of an estimate annually before August 15 to the City’s Planning Commission and Director of the Budget (id., § 1203, subd. 1, par. b; § 1203, subd. 2). The Authority may sue and be sued (id., § 1204, subd. 1). It is authorized to appoint its employees subject to the provisions of the Civil Service Law (id., § 1204, subd. 6) and the Rules of the City Civil ¡Service Commission (id., § 1210, subd. 2). Authority and city employees are recognized equally for all purposes of civil service treatment, including transfers between the two agencies (id., § 1210, subd. 2).
It has been demonstrated (supra, pp. 177-178) that pursuant to section 95 of the Civil Service Law, it shall be the duty of all public officers — each of the individual respondents — to conform and to comply with and to aid in all proper ways in carrying into effect the provisions of the Civil Service Law.
*180 The City Comptroller is invested with broad, continuing powers of examination of accounts, books and any other records or papers relating to the financial condition of the Authority (id., § 1208, subd. 2).
The legal relationship and obligations of these respondents under the law are plain. They are held to be proper and necessary parties.
The form of the petition leaves much to be desired. Its draftsmanship is inartistic in its indiscriminate reference to the remedy of prohibition for conduct in excess of jurisdiction or contrary to the law in reference to offers and/or additional payments of compensation to the members of the Transport Workers’ Union.
The respondent Authority cross-moves on Chairman O’Grady’s affidavit for an order dismissing the petition upon the same ground as the other respondents and the additional ground for insufficiency in law. The main arguments are the petitioner’s lack of standing as a private citizen without special or peculiar interest; his intrusion confuses the negotiations to settle the strike; the alleged unworkability of the penalty provisions as evidenced by the 1963 amendments (supra), intended temporarily to ease the penalties; prematurity, absent any finding that any particular employee did in fact strike; and, finally, that without any raises there can be no settlement of the strike.
It is contended in the briefs that the petitioner’s chosen remedy is the wrong one, in view of the provisions of subdivisions 1 and 2 of section 102 of the Civil Service Law, authorizing taxpayer’s actions in equity to recover illegal payments. It was vaguely argued by Authority without any impressive development that the amendment of section 108 penalty provisions in 1963 (L. 1963, ch. 702) somehow effected a repealer and consequent extinguishment of the statute.
Without separate answer to all of the respondents’ points, a brief reference to history and precedent is enough to clarify the subject and sustain dismissal of the cross motions.
The petition may stand and the proceeding may properly continue despite imperfections in form since jurisdiction over the parties has been obtained (CPLR 103, subd. [c]). The proceeding continues to determine the question whether the respondents failed to perform their duties enjoined upon them by law, in other words, in the nature of mandamus (CPLR, § 7803, subd. 1).
As far back as Slavin v. McGuire (205 N. Y. 84) it has been the law that a taxpayer’s action such as is authorized by section 102 of the Civil Service Law, formerly section 28 of the Civil Service Law, is altogether inappropriate for correcting illegal *181 action on the part of the Civil Service Commissioner. The contrary view expressed in People ex rel. Sims v. Collier (175 N. Y. 196) was retracted by the Court of Appeals in People ex rel. Schau v. McWilliams (185 N. Y. 92, 99-101). A taxpayer’s action under section 51 of the General Municipal Law, even though recognized, would not lie against the City Civil Service Commission. Although its members are local officers, they act in carrying out the provisions of the State Civil Service Law (Slavin v. McGuire, 205 N. Y. 84, 87, supra). That obviously applies to the Authority as an agency of the State.
Following Slavin (supra), the Court of Appeals in McCabe v. Voorhis (243 N. Y. 401, 411) ruled, on the cited authority of an older case, People ex rel. Daley v. Bice (129 N. Y. 449) and other cases which may be taken as typical, that a citizen and elector has a sufficient interest to make the application for an order of mandamus to compel the performance by a public officer of a public duty.
Next, Matter of Andresen v. Rice (277 N. Y. 271) was a mandamus proceeding. The relief sought, in part, is stated in the Reporter’s syllabus: items (7) and (8) requiring submission of payrolls for certification to the Civil Service Commission and to compel the Comptroller to refrain from paying compensation. The late Chief Judge Frederick Evan Crane opened the opinion for the majority with this observation (id., p. 274): “ In every Civil Service case we must start with the provision of the State Constitution (Art. V, § 6), which cannot be repeated too often, as it is the groundwork upon which all.legislation on the subject is built.”
Sustaining the petitioner’s standing to maintain the proceeding, the court held (p. 281): “ The point has been raised that the petitioner here is not capable of presenting this matter to the court, as he has not applied for a position on the force. He is of age to make such application, but, more than that, he is a citizen and resident of the State of New York, and, being such, is capable of presenting to the courts his petition for enforcement by officials of their mandatory duties. (Matter of Social I. E. Assn. v. Taylor, 268 N. Y. 233; Matter of Kornbluth v. Rice, 250 App. Div. 654, affd. 275 N. Y. 597; People ex rel. Schau v. McWilliams, 185 N. Y. 92; Matter of Baird v. Bd. of Supervisors, 138 N. Y. 95, 116; Matter of McCabe v. Voorhis, 243 N. Y. 401, 411; Matter of Friedman v. Finegan, 268 N. Y. 93, 97. See, also, our recent cases on the intent and purpose of the Constitution: Palmer v. Bd. of Education, 276 N. Y. 222; Matter of Carow v. Bd. of Education, 272 N. Y. 341; Matter of Scahill v. Drsewucki, 269 N. Y. 343, and also Chittenden v. Wurster, 152 N. Y. 345.) ”
*182 In this background, Matter of Welling v. Fullen (164 Misc. 456, affd. without opn. 252 App. Div. 856) is particularly applicable on its facts. Mandamus was invoked in a proceeding pursuant to former article 78 of the Civil Practice Act by a private citizen for an order directing the former Transit Commission forthwith to terminate the employment of the late and former Mayor James J. Walker, to expunge all records of his employment and to desist from submitting any payroll or voucher for payment of salary or compensation to him, partly because his appointment was without prior civil service certification. At Special Term, former Justice Samuel I. Rosenman (164 Misc. 456, 461-462, supra), in over-ruling the objection of lack of capacity to sue, held: ‘1 The first question presented by the respondents is the capacity of the petitioner to maintain these proceedings. The petition is brought under the provisions of the new article 78 of the Civil Practice Act * * * The proceeding is in the nature of what has heretofore been known as a mandamus proceeding. If the relief here sought is obtainable in such proceeding the petition may be presented by any citizen. (Matter of McCabe v. Voorhis, 243 N. Y. 401, 411.) The fact that the relief requested in connection with the payrolls requires negative rather than affirmative action is no bar to a mandamus proceeding. (Matter of Potts v. Kaplan, 264 N. Y. 110; Matter of Kraus v. Singstad, 275 id. 302.) ” Continuing in paraphrase of Judge Rosenmait’s final words, citing People ex rel. Schau v. McWilliams (185 N. Y. 92, supra) if 30,000 Authority employees failed to report for work on January 1, 1966 and remained out for 13 days, on that alone but moreover in the background of commonly known activities, it is presumed that they were on strike (§ 108, subd. 4) thereby sacrificing their jobs except that they could return subject to no higher pay for three years and on probation for five years (§ 108, subd. 5, pars, [a], [b], [c]). Those not having sought a hearing to establish that they were not striking would be concluded (§ 108, subd. 6). For these reasons, in continuing paraphrase, the respondents can only act bona fide in legal discharge of their duties by not submitting or certifying any payrolls showing any increase in compensation. Conduct in violation is both misfeasance and malfeasance, properly subjects for the maintenance of this proceeding by this or any other citizen. (Accord, Matter of Cohn v. Board of Supervisors, 34 Misc 2d 928, 929-930, mod. 17 A D 2d 104; Matter of Bergerman v. Murphy, 199 Misc. 1008, 1015-1016; Matter of Welling v. Marsh, 179 Misc. 1033, 1035.)
The Corporation Counsel makes the point that the temporary nature of chapter 702 of the Laws of 1963 which authorized, a *183 review proceeding pursuant to article 78, by its expiration on July 1, 1965, has resulted in its extinguishment. It is stated that termination of that remedy manifested the Legislature’s recognition that ordinarily such a proceeding could not be maintained in the absence of a showing that a personal or property right was affected by the action complained of. The argument is fuzzy and in no way convincing.
As the court grasps the orally presented but undeveloped point of Authority at the argument, it suggests that the temporary amendment in 1963 to be effective until July 1, 1965, in some way constituted a repeal of all the penalty provisions of section 108. The plain language of the title, the preamble, the enacting clause and last section 3 of the bill as passed and signed into law is that of a temporary amendment. There is neither word nor hint of repeal. In his message of approval upon signing the amendment into law and two years later in his veto message No. 135 —1965 of the bill to repeal the Condon-Wadlin Law, Governor Rockefeller characterized the amendment as temporary.
Even if the amendment were to be deemed a repeal of the prior law, if upon comparison of the respective provisions of the two laws, it appears that the same provisions were continued in the new law, those former provisions would be considered as having been continued rather than re-enacted (General Construction Law, § 95). In any case, the law before April 23, 1963, during the interval from April 23, 1963 until July 1, 1965, and ¿/rifatoM as it remains in effect today, states without change in paragraph (a) of subdivision 5, the condition for re-employment, as to the striker “ his compensation shall in no event exceed that received by him immediately prior to the time of such violation ”. There is no need for interpretation; the Legislature’s intent is clear. In any event the court will not make a definitive holding, leaving it to the respondents to raise the point by defense in their answers, or otherwise, as they may be advised.
Our highest State court (by Associate Judge Bergan in Letterio and Kohler, supra, p. 312) gave the warning of that great danger which is implicit here in the demonstrated violation of the law. First, the sworn public employees by their strike. Next, compounded by sworn public officers in their compromise, yielding and submitting to illegally extorted demands. No personal reasons on their part can justify the ransom extorted from eight million citizens of a government by 30,000 employees, four tenths of one per centum. If responsible officials cannot stand up in firm resistance, the court will. Submission today to this unlawful misconduct, under the guise *184 of civil disobedience, grinding into the dirt the civil rights and liberties of the city’s millions is craven servility and could lead to disaster for all. And the fear is great that it would come too soon if not bucked abruptly. That opposition could not be too firm, too determined, too stalwart, unyielding and intransigent. The continuing existence of our form of government, the very life, liberty and welfare of the whole citizenry, demands no easier course. It is plain that the respondents are forbidden at their peril from any course which would increase the compensation of the strikers in violation of the Condon-Wadlin Law before January 14, 1969.
The court is limited by the clear language of CPLR 7804, upon overruling the respondents’ objections in point of law. While the case for relief for petitioner is clear, summary judgment may not be granted before answer. Distinguishable from the comparable provision found in CPLR 3211 (subd. [c]) applying to actions, which states that the court may treat the motion before answer as for summary judgment, CPLR 7804 (subd. [f]) directs that if the motion raising an objection in point of law (in the proceeding) is denied, “ the court shall permit the respondent to answer ”. Professor Peter W. Thornton’s Practice Commentary following CPLR 7804 in McKinney’s Consolidated Laws (Book 7B, CPLR 7801-7806 at pp. 179, 181) regarding the practice difference between action and proceeding, refers to the Fifth Preliminary Beport of the Advisory Committee on Practice and Procedure (N. Y. Legis. Doc., 1961, No. 15, p. 755) which clearly states that the difference was intended.
appendix 1
City of Detroit v. Division 26 of Amalgamated Assn. of St. Employees (332 Mich. 237, app. dsmd. 344 U. S. 805, petition for rehearing den. 344 U. S. 882) involved a statute similar to Condon-Wadlin, the Hutchinson Law of Michigan. Its constitutionality was upheld in a comprehensive opinion by the Supreme Court of Michigan.
The Supreme Court of Michigan stated (pp. 245-246):
“ In reaching decision in the instant case it is essential to keep in mind that the provisions of the Hutchinson act apply only to ‘ public employees.’
‘ ‘ The act is designed, as a matter of public policy, to prevent strikes by public employees (Local Union No. 876 International Brotherhood of Electrical Workers v. State Labor Mediation Board, 294 Mich 629) by providing that by striking, such an employee 1 shall thereby abandon and terminate his appoint *185 ment or employment, ’ and by limiting or restricting the right of the public employer to reemploy a public employee who participated in a strike.”
* * *
“ A basic reason urged by cross-appellants in challenging the constitutionality of the Hutchinson act is that it contains no provision for judicial review of rights asserted by a discharged public employee, and hence they are deprived of due process of law. However, by section 6 of the act provision is made for such an employee to have a hearing before the officer or body having power to remove such employee, and for a right of review of a holding adverse to such employee before the labor mediation board. We have held that like provisions are quasi-judicial and afford to the discharged employee compliance with his constitutional rights (p. 246).
* * *
“We know of no constitutional provision which gives an individual the right to be employed in governmental service or to continue therein. If there is no such right then there is no constitutional inhibition of reasonable restrictions or limitations being applied thereto (p. 247).
* * *
“ There is ample authority to the effect that public employment does not vest in such employees any fixed or permanent rights of employment. As individuals or in groups public employees may discontinue their employment, but, having done so, such public employees have no vested right to insist upon their reemployment on terms or conditions agreeable to the employees, or even without compliance with such conditions. To hold otherwise would result in public agencies being powerless to render public service and to effectively administer public affairs; and the public would thereby be deprived of its right to efficient government (pp. 247-248).
* * *
“ In view of the foregoing and, also, in accord with authorities hereinafter noted, it cannot be held * * * that by the Hutchinson act the striking employees of Detroit’s street railway system are .subjected to a statute which violates the United States Constitution (art I, § 10) and the State Constitution [1908] (art II, § 9), prohibiting passage of bills of attainder; nor that they are deprived of rights without due process of law (United States Constitution, Fourteenth Amendment; State Constitution [1908], art II, § 16); nor of equal protection of *186 the laws (United States Constitution, Fourteenth Amendment; State Constitution [1908], art II, § 1). Nor are we in accord with cross-appellants’ contention that this act impairs contractual rights possessed by employees of Detroit’s street railway system, in violation of constitutional provisions (United States Constitution, art I, § 10; State Constitution [1908], art II, § 9). The Hutchinson act cannot be held unconstitutional on any of the grounds just above noted” (pp. 252-253).
• At Special Term, in Railway Mail Assn. v. Murphy, it was stated (180 Mise. 868, 875 [Sup. Ct., Albany County, 1943], revd. on other grounds, sub nom. Railway Mail Assn. v. Gorsi, 267 App. Div. 470 [3d Dept., 1944], 293 N. Y. 315 [1944], 326 U. S. 88 [1945]): “ Nothing is more dangerous to public welfare than to admit that hired servants of the State can dictate to the government the hours, the wages and conditions under which they will carry on essential services vital to the welfare, safety and security of the citizen. To admit as true that government employees have power to halt or check the functions of government, unless their demands are satisfied, is to transfer to them all legislative, executive and judicial power. Nothing would be more ridiculous.”
The Supreme Court of Errors of Connecticut, in Norwalk Teachers’ Assn. v. Board of Educ. of City of Norwalk (138 Conn. 269, 276) stated: “In the American system, sovereignty is inherent in the people. They can delegate it to a government which they create and operate by law. They can give to that government the power and authority to perform certain duties and furnish certain services. The government so created and empowered must employ people to carry on its task. Those people are agents of the government. They exercise some part of the sovereignty entrusted to it. They occupy a status entirely different from those who carry on a private enterprise. They serve the public welfare and not a private purpose. To say that they can strike is the equivalent of saying that they can deny the authority of government and contravene the public welfare.”
The Court of Common Pleas of Ohio (Cuyahoga Co., Artl, J.), in City of Cleveland v. Division 268 of Amalgamated Assn. of St. & Elec. Ry. & Motor Coach Employees of America (90 N. E. 2d 711, 715 [Ohio, 1949]), expressed itself as follows:
“ This section of the General Code that I just read is merely expressive of the common law. The Legislature of Ohio, like the United States Congress and legislatures of many other states (Ohio, New York, Michigan, New Jersey, Virginia, Minnesota, Pennsylania, Missouri, Indiana, Texas, Nebraska and Washington) has enacted legislation spelling out the common *187 law as it is and has been known. And why! I think it is clear that in our system of government, the government is a servant of all of the people. And a strike against the public, a strike of public employees, has been denominated in the decisions cited above, as a rebellion against government. The right to strike, if accorded to public employees, I say, is one means of destroying government. And if they destroy government, we have anarchy, we have chaos.
“ I think that is definitely why the Legislature has spelled out the question of whether or not public employees shall have the right to strike.
“ The Legislature, in no unmistakable terms, has set forth what has been true under the common law.”
appendix 2
PUBLIC EMPLOYEES’ ANTI-STRIKE LAW
On approving chapter 391 of the Laws of 1947 which prohibits strikes by public employees, the Governor stated:
‘ ‘ Strikes against Government are wholly unlawful. This bill places upon our statutes a clear statement of the principles involved and provides effective penalties in case of violation.
“ The bill declares that a public employee who strikes loses his Civil Service protection, and if re-employed does not regain it for five years. To remove any possibility of profit from his wrongful act, his compensation may not increased for three years.
“ The bill carefully preserves every right enjoyed by public employees to express their views, complaints and grievances, privately or publicly.
“ The conditions of public and private employment are entirely different. The special characteristics of public employment are as follows:
“ 1. Public service is a public trust not only for elected officials but for all employees. It is a trust in behalf of all the people. A trustee cannot strike or falter in the performance of his duties.
“ 2. A public employee has as his employer all the people. The people cannot tolerate an attack upon themselves.
‘ ‘ 3. The public employee has no employer who may profit from depressed conditions of employment.
‘1 4. The conditions of public employment, the rules of governing it, and the revenues available to pay for it are all matters of public record.
“ 5. Public employees have the right to improve their conditions through arguments before all the people, before legislative *188 bodies, to administrative officials and, of course, by their own ballots on election day. These rights are so effective that among all the types of employment over the years, public employment has been rated as having the best and most desirable conditions. Public employees by virtue of their rights or otherwise enjoy highly beneficial pension systems, supported in large part by Government, unprecedented security and stability of employment and compensation through bad times as well as good and machinery for correction of individual grievances before administrative officials, before Civil Service Commissions, and even in the courts.
“ The duty of public employees is to the whole of society. A. strike of firemen could overnight permit the destruction of a whole city. A strike of police could endanger the safety of millions of people and of all their possessions. A strike of sanitation workers could almost overnight produce an epidemic threatening the lives of other millions of people. A strike in the mental hospitals of the State could cause the deaths of thousands of patients by starvation or by the violence of other disturbed patients.
“ Government is not an end in itself. It exists solely to serve the people. The very right of private employees to strike depends on the protection of constitutional government under law. Every liberty enjoyed in this Nation exists because it is protected by government which functions uninterruptedly. The paralysis of any portion of Government could quickly lead to the paralysis of all society. Paralysis of government is anarchy and in anarchy liberties become useless. A strike against Government would be successful only if it could produce paralysis of Government. This no people can permit and survive.
“ The penalties in this bill are moderate but firm. By their clear terms they will protect loyal employees and what is more important will protect the interests of all the people.” (1947 N. Y. Legis. Annual, pp. 36-37.)
APPENDIX 3
[Appendix 3 consisted of quotations from sections 95, 97, 100 (subds. 1, 2), 101, 102, 105 (subd. 3) and 108 of the Civil Service Law.]